Faruq Kwame JABARI, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–07–00922–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Nov. 20, 2008.

Mark Casselle Grafenreed, Steven Alan Hershkowitz, Houston, TX, for Appellant.

Donald W. Rogers Jr., Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Judges JENNINGS, HANKS, and BLAND.

## OPINION

JANE BLAND, Justice.

A jury convicted Faruq Kwame Jabari, also known as Howard or Harry Johnson, of aggravated sexual assault, and sentenced him to confinement for life in prison. Jabari appeals his conviction, contending in five issues that: (1) the trial court abused its discretion by allowing evidence of extraneous offenses during the guilt/innocence phase of the trial; (2) he was denied his due process right to a fair and impartial jury and his right to confront the witnesses against him when the jury witnessed an outburst in Spanish by the complaining witness; (3) he was denied due process because the prosecution withheld material and exculpatory evidence from defense counsel in violation of the duty owed under *Brady v. Maryland*[1]; (4) the cumulative effect of the DNA evidence against him did not cure the harm caused by the trial court's errors and the denials of his constitutional rights; and (5) the trial court abused its discretion by not conducting a hearing on his motion for new trial.

## Background

Beatrice Conde, a seventeen-year-old recent immigrant from Mexico, testified that, on February 16, 2006, she lived in the predominantly Hispanic Villa de Matel apartment complex in south Houston with her boyfriend Enrique Lopez. Conde had been living in the apartment for about three weeks, having previously lived with her father. At about 1:30 that afternoon, Conde was home alone in the apartment while Lopez was at work. Something on the stove began to burn, and Conde opened the door of the apartment to let out the smoke. At this time, an unfamiliar black man wearing a visor and glasses, walked by the open apartment door and attempted to begin a conversation with Conde. He asked if she spoke English, and spoke to her in English and broken Spanish. The man asked if she would make him something to eat, and she agreed to make him a sandwich. The man left, saying he would return in a few minutes, and Conde partially closed the door and went to make the sandwich. About five minutes later, the man returned, and Conde told him the sandwich was ready. He came inside Conde's apartment without being invited and closed the door behind him. He sat down and took a bite of the sandwich, and Conde went to open the door again. When she got to the door, the man grabbed her by the hair, pulled out a small, squared-off, silver firearm, and took her to the bedroom. Conde began to scream, and the man threw her on the bed and put a pillow over her face. Conde stopped screaming, and the man removed the pillow and told her to take off her pants. He pulled down his own pants, put on two condoms, held the pistol to Conde's temple and raped her. He pulled up his pants, leaving the two condoms on, and told her not to either leave the bedroom

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

until he left or tell anyone about the rape, or he would come back and kill her. He then left the apartment.

As soon as the man left, Conde locked the door and called Lopez on his cell phone at work. Lopez reported the rape to the apartment manager. The apartment manager called the police. Conde told the investigating officer that she had been raped.

At trial, the prosecutor asked Conde if she saw her attacker in the courtroom. Conde initially said no. The prosecutor continued questioning Conde until she noticed that Conde kept looking at someone in the courtroom and asked her who she was looking at. Conde began to cry and said she was looking at a man who looked like her attacker, and she thought that it was him. She began to describe the clothes that he was wearing, and said he was wearing a white shirt. Then she began screaming and crying and said things in Spanish that were not translated or recorded. The bailiff removed the jury from the courtroom until Conde calmed down. Jabari's counsel moved for a mistrial on the basis that Conde's untranslated Spanish statements were not testimony but were said in open court in front of the jury and were prejudicial. The trial court denied the motion for mistrial but instructed the jurors to disregard anything that they had heard that was not in direct response to a question asked. The prosecutor continued her direct examination of Conde. Conde said that when first asked to identify her attacker, she did not see him in the courtroom because he was obscured from her view. She testified that when she saw him, it startled her. She identified Jabari as her attacker.

Officer F. Salazar of the Houston Police Department arrived at Beatrice Conde's apartment complex in response to a call from the apartment manager. He met the manager at the door to Conde's apartment, and the manager took him back to the bedroom, where he saw Conde lying on the bed in a fetal position. Conde told Officer Salazar what had happened, and he collected evidence from the apartment, including the sandwich from which Conde's attacker had taken a bite. He submitted the sandwich for DNA testing. Salazar testified that he did not collect a glass from the table where the sandwich had been. The DNA profile from the sandwich matched the DNA profile later taken from Jabari after his arrest.

The State sought to introduce evidence of extraneous offenses to prove identity. The trial court allowed the admission of two such offenses. Maria Pena testified that she lived in an apartment complex in south Houston. At around noon on February 23, 2006, a week after Conde's rape, Pena was home alone with her baby when she heard a knock. Pena answered the door, thinking it was her sister, but instead it was a black man wearing glasses, whom she had never seen before. The man asked her in broken Spanish if he could borrow a pen, and she pretended not to understand him. She tried to close the door, but he pushed it open and came inside. The man pulled out a chrome firearm, grabbed her by the neck, and held the gun to her head. He pushed Pena into the walk-in closet where her baby was sleeping in her crib, and Pena fell to the floor. Pena pleaded with him not to hurt her or her baby, and he pointed the firearm at the baby, so she decided to cooperate. He removed her pants and her panties, put a towel on the floor, and put on a condom. The man told her not to look at him, and he raped her. When he was finished, the man got up and told Pena not to leave the closet for fifteen minutes. After the man left, Pena went to her sister's apartment, and her sister called the police. Pena identified Jabari as the man who raped her and identified the firearm Jabari

had in his possession when he was arrested as the firearm with which she was attacked.

Gemina Guadarrama testified that on January 12, 2007, she was home with her young son at the primarily Hispanic Cedar Glen apartment complex in southwest Houston. At about 9:00 a.m., she was getting ready to walk to the supermarket and had put her son in his stroller when there was a knock on the door. Guadarrama opened the door, and a black man, wearing a hat and glasses, stood outside and asked her in broken Spanish for someone named Carlos. Guadarrama had a hard time understanding his Spanish, so the man asked if anyone was home who spoke English. Guadarrama told him there was no one else, and the man said he would come back later with someone who could speak Spanish and left. As Guadarrama was leaving her apartment for the supermarket, the man returned and asked her if she had a pencil and paper. She left her son in the stroller outside and went a few feet inside the door to get the pencil and paper. Then she noticed the man bringing the stroller back inside the door, and she became concerned. The man closed the door and grabbed Guadarrama and pointed a "plated" firearm at her. The man told her he wanted money, and she gave him ten dollars. He searched the apartment to make sure no one else was there, and then he held the firearm to her back and forced her upstairs to the bedroom. Guadarrama understood that the man wanted her to take her clothes off, and she did. Then he asked her if she had a condom; she told him no, and he said that he had one. He laid down on the bed and told her to get on top of him, and she cooperated. The man raped her and forced her to act like his wife or partner. He told her not to look at him. After he raped her, he told her to get her son and go into the bathroom for fifteen minutes to give him time to leave, and not to tell the police or her husband what happened. She heard him turn on the television and wander around the apartment for about five minutes before she heard him leave. Guadarrama called her husband, and he came home and called the police. In court, Guadarrama identified Jabari as the man who raped her, and she identified the weapon that he had in his possession at the time of his arrest as the firearm he used in the rape.

Officer P. Moreno testified that he was an officer in the sex crimes unit of the homicide division of the Houston Police Department and had been for about sixteen years. He testified that stranger-on-stranger rape, as alleged in this case, often happens in a serial pattern with similarities among the incidents of rape. Here, Officer Moreno interviewed Beatrice Conde, Maria Pena, and Gemina Guadarrama about their rapes, and observed commonalities among the cases. All of the rapes took place in predominantly Hispanic apartment complexes, the victims were all home alone or with small children during the day, and each described her attacker as a black man wearing glasses and using a small chrome-plated firearm. Based on this information, Officer Moreno developed a profile of the rapist, canvassed the neighborhood, and held a news conference to get a description of the attacker out to the public.

Officer R. King testified that he was on patrol duty on the afternoon of January 26, 2007, when he was called to the Glenmont Colony apartments in southwest Houston, a few blocks from Guadarrama's apartment, because a maintenance man had seen a man that matched the description of a composite drawing of the rapist released to the public. The maintenance man directed Officer King and another officer to an apartment. Jabari was inside the apartment, and he cooperated with the

officers, gave them his identification and consent to search his vehicle, and warned them that there was a weapon inside the vehicle. He wore a baseball cap and glasses, and had a condom in his pocket. The officers arrested Jabari. While Jabari was in custody, the police created a lineup. They showed the lineup to Gemina Guadarrama, and she identified Jabari as her attacker. Police videotaped the same lineup and showed it to Maria Pena. Pena also identified Jabari. Conde did not view the lineup because police could not locate her.

Jabari testified on his own behalf that he did not commit these rapes. He testified that he was at work, at the Salam Community Center, which he owned, on the days of Conde and Pena's rapes, and that he was taking his wife to therapy for an injury on the day of Guadarrama's rape. He testified that he spoke a little Spanish, but had never taken any Spanish classes. He conceded that he was convicted in California of two cases of forcible rape, and in California and Texas for failure to register as a sex offender. No one else testified on Jabari's behalf.

## Extraneous Offenses

Jabari contends that the trial court erred in admitting the evidence of the two unadjudicted extraneous offenses because they are not sufficiently similar to the complaining witness's description to establish a signature or modus operandi, and the probative value of the evidence is substantially outweighed by its potential for prejudice. Jabari further contends that the trial court improperly admitted evidence that his two prior forcible rape convictions in California involved Hispanic women.

We review a trial court's admission of extraneous evidence under an abuse of discretion standard. *Page,* 137 S.W.3d at 78; *Lane,* 933 S.W.2d at 519. As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and we uphold the ruling. *Thomas,* 126 S.W.3d at 143.

■ Texas Rule of Evidence 404(b) prohibits admission of extraneous offenses to prove a person's character or to show that the person acted in conformity with that character. *See* TEX.R. EVID. 404(b). Extraneous offenses may, however, be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Montgomery v. State,* 810 S.W.2d 372, 387–88 (Tex.Crim.App.1990). An extraneous offense may be admissible to prove identity only if the identity of the perpetrator is at issue in the case. *Page v. State,* 213 S.W.3d 332, 336 (Tex.Crim.App. 2006); *Lane v. State,* 933 S.W.2d 504, 519 (Tex.Crim.App.1996). A defendant can raise the issue of identity by cross-examination, by impeaching the identifying witness on a material detail of identification. *Page v. State,* 137 S.W.3d 75, 78 (Tex. Crim.App.2004); *Siqueiros v. State,* 685 S.W.2d 68, 71 (Tex.Crim.App.1985). Additionally, a defendant may raise the issue of identity by presenting an alibi. *Moore v. State,* 700 S.W.2d 193, 201 (Tex.Crim.App. 1985); *Hughes v. State,* 962 S.W.2d 89, 92 (Tex.App.-Houston [1st Dist.] 1997, pet. ref'd). Here, Jabari offered both an alibi defense and impeached Conde's identification of him as the perpetrator, placing identity at issue in this case.

■ Raising the issue of identity does not automatically render evidence of an extraneous offense admissible. *Page,* 213 S.W.3d at 336. Rather, such evidence is admissible under both Rules 403 and 404(b) if it is relevant, aside from its tendency to show action in conformity with character, and its probative value is not substantially outweighed by any unfair prejudice. *Id.; Johnston v. State,* 145 S.W.3d 215, 220 (Tex.Crim.App.2004).

■ Where the State uses an extraneous offense to prove identity by comparing common characteristics of the crime, the extraneous offense must be so similar to the charged offense that it illustrates the defendant's "distinctive and idiosyncratic manner of committing criminal acts." *Page,* 213 S.W.3d at 336 (quoting *Martin v. State,* 173 S.W.3d 463, 468 (Tex.Crim. App.2005)). Such evidence must demonstrate a much higher degree of similarity to the charged offense than extraneous offenses admitted for other purposes, such as intent. *Bishop v. State,* 869 S.W.2d 342, 346 (Tex.Crim.App.1993). Without a high degree of similarity, the probative value of the extraneous offense evidence is outweighed by its prejudicial effect. *Id.* In reviewing a trial court's decision to admit such evidence, appellate courts should take into account the specific characteristics of the offenses and the time interval between them. *Thomas v. State,* 126 S.W.3d 138, 144 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd). Sufficient similarity may be shown by proximity in time and place *or* by a common mode of committing the offenses. *Lane,* 933 S.W.2d at 519 (citing *Ransom v. State,* 503 S.W.2d 810, 813 (Tex.Crim.App.1974)) (emphasis in original).

■ Jabari contends on appeal that the extraneous offenses are not similar enough to the charged offense to constitute proper identity evidence. We disagree. While Jabari points out differences between Conde's rape and Pena's and Guadarrama's rapes, sufficient similarities exist between the offenses to support the trial court's decision to admit them. In all three cases: the victims lived in apartment complexes predominantly occupied by Hispanics; the rapes occurred during the day and the victim was the only adult at home; the victims spoke little English; the assailant, a black male who wore glasses, spoke to the victims in English and broken Spanish; the assailant approached the victims using some kind of ruse, like asking for a sandwich or a piece of paper and a pencil or if someone lived there; the assailant used the same sort of weapon in each case—a small chrome-plated firearm; the assailant used a condom, left the scene without removing it, and told the victims not to tell anyone about what happened and to stay in one place until he left. Two of the offenses occurred within a week of each other at apartment complexes near Jabari's residence at the time, and the third occurred eleven months later, blocks from the apartment complex where Jabari was arrested in southwest Houston. *See Thomas,* 126 S.W.3d at 146 (holding that eleven months between offenses is not so remote in time as to be inadmissible). Each of the victims identified Jabari as her attacker in court. We hold that the facts and circumstances of the two extraneous offenses are sufficiently similar to the charged offense that the trial court's decision to admit them to prove identity falls within the zone of reasonable disagreement.

■ Under Rule 403, we evaluate relevant evidence to determine if its probative value is substantially outweighed by the potential for unfair prejudicial effect. *See* TEX.R. EVID. 403. We consider several factors:

(1) How compellingly evidence of the extraneous misconduct serves to make more or less probable a fact of consequence,

(2) The potential for the "other crime, wrong, or act" has to impress the jury in some irrational but indelible way,

(3) How much trial time the proponent needs to develop the evidence of the extraneous offense, and

(4) The proponent's need for the extraneous offense

*Lane,* 933 S.W.2d at 520. We uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Id.*

Given the similarity of the assailant's modus operandi and the relative proximity of the rapes—two to each other and all three as to Jabari's current residence—and the witnesses' in-court identification of Jabari, the extraneous offense evidence is compelling as to the issue of identity. Conde initially did not identify her attacker at trial, and she could not be found before trial to identify Jabari in a photo lineup. The defense used these facts to impeach Conde on the issue of identity, thus providing the State with a reason to develop extraneous offense evidence. Conde's description of her attacker and the modus operandi of the crime match the other two offenses, making her identification of Jabari more probable.

The admission of the similar extraneous offenses carried a risk of irrationally impressing the jury of Jabari's character conformity, which the law seeks to avoid. The impermissible inference of character conformity can be minimized, however, with a limiting instruction. *Lane,* 933 S.W.2d at 520. Here, the trial court instructed the jurors to limit their consideration of the extraneous offense evidence. Moreover, it was the similar nature of the crimes that was the focus of the testimony. Pena and Guadarrama were the only two witnesses called to testify at trial about extraneous offenses. Their testimony did not take up a significant portion of the trial, and the amount of time used for their testimony was reasonable and not excessive.

Finally, the State's need for the evidence was strong. Conde initially struggled during her testimony to identify Jabari as her attacker, and she was impeached by the defense. Although DNA evidence on the sandwich from Conde's apartment matched Jabari's, such a fact establishes that Jabari was at the apart-ment, but does not directly identify him as her attacker. Thus, the extraneous offenses were significant to the State's case.

The trial court was within the zone of reasonable disagreement when it ruled that the probative value of the evidence of the two unadjudicated extraneous offenses was not substantially outweighed by the danger of unfair prejudice. Thus, we hold that the trial court did not abuse its discretion in admitting the evidence under Rule 403.

 Jabari further contends that the State improperly introduced an underlying fact of his prior convictions for forcible rape in California. On direct examination, Jabari's attorney adduced evidence of Jabari's two forcible rape convictions in California and his two convictions for failure to register as a sex offender in California and in Texas. On cross-examination, the State brought out the detail that both California rape victims were Hispanic. Defense counsel objected, and the trial court overruled the objection.

 Under Texas Rule of Evidence 609, the fact of a prior conviction is generally admissible to impeach a witness if that crime was a felony or involved moral turpitude. *See* TEX.R. EVID. 609. However, the details of the conviction are generally inadmissible for the purpose of impeachment. *Mays v. State,* 726 S.W.2d 937, 953 (Tex. Crim.App.1986); *Arebalo v. State,* 143 S.W.3d 402, 407 (Tex.App.-Austin 2004, pet. ref'd).

In its brief, the State concedes that the details of the California offense were not admissible for the purpose of impeachment under Rule 609, but argues that they were admissible under Rule 404(b) for the purpose of proving identity because the convictions were, in fact, extraneous offenses, and their details tend to prove

identity. We disagree. Under the Rule 404(b) analysis, the State adduced no evidence that the details of the California rapes were so similar to the rape in this case as to indicate a signature or *modus operandi*. The only similarity proffered by the State between the instant offense and the California rapes is that the victims were Hispanic. The convictions occurred 1989 in another state, and Jabari encountered the victims in a public place and invited them back to his residence, where he raped them. Despite the decade and physical distance between the California rapes and the rape in the instant case, the rapes might have been admissible if Jabari had used similar tactics on the California victims. *See Lane*, 933 S.W.2d at 519 (holding that sufficient similarity between the mode of committing the offenses made the offenses admissible, even though they occurred a decade apart and in different states). Here, the State provided no facts that indicated that Jabari's mode of commission was similar in these two cases to the present case. Accordingly, we hold that the facts the State presented as to the two California convictions are not similar enough to constitute a signature under Rule 404(b), and thus it was error to admit the detail to show conformity of character. *See Avila v. State*, 18 S.W.3d 736, 741 (Tex.App.-San Antonio 2000, no pet.).

■■■ Consequently, we must determine whether the trial court's error was harmful. Error in the admission of evidence is non-constitutional error subject to a harm analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure. TEX. R.APP. P. 44.2(b); *see Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.1998). Under that analysis, we disregard any non-constitutional error that does not affect substantial rights. TEX.R.APP. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Morales v. State*, 32

S.W.3d 862, 867 (Tex.Crim.App.2000) (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997)). Appellate courts should not overturn a criminal conviction for non-constitutional error if the court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but slight effect. *See Johnson*, 967 S.W.2d at 417. The improper admission of evidence does not constitute reversible error if other properly admitted testimony proves the same facts. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex.Crim.App.1999).

Here, the trial court properly admitted the convictions themselves under Rule 609. The improperly admitted evidence is the detail that the victims of Jabari's prior rapes in California were Hispanic. The other evidence adduced at trial, however, already had indicated that Jabari targeted Hispanic women, which is presumably what the State sought to prove in admitting that fact about the California victims. The evidence that the prior rapes involved Hispanic women was not important to the State's case, as the State had built a strong case with the testimony of Conde, Pena, and Guadarrama that Jabari had raped them. Additionally, the State presented DNA evidence placing Jabari at Conde's apartment, where the rape occurred. Given the other evidence, we hold that the error did not have a substantial or injurious effect in determining the jury's verdict, and thus did not affect Jabari's substantial rights so as to warrant reversal. Ample other evidence existed on which the jury could have found Jabari guilty.

### Failure to Inquire into Witness's Spanish Outburst

■■■ Jabari contends that he was denied his due process right to a fair and impartial jury and his Sixth Amendment right to confront witnesses against him when Conde had an emotional outburst

during her testimony in the presence of the jury in Spanish, that was not translated or recorded. First, Jabari contends that the trial court erred in failing to conduct an inquiry into what part of the outburst the jury overheard to determine whether an adequate curative instruction was possible. Second, Jabari contends that he was denied his Sixth Amendment right to confront witnesses against him because he was unable to cross-examine Conde about the remarks. Third, Jabari argues that the harm was exacerbated when the prosecution referred to the outburst in closing arguments.

Jabari's complaint that the trial court failed to conduct an inquiry into what was said is not preserved for review. To preserve a complaint for appellate review, a party must present the trial court with a timely request, objection, or motion stating specific grounds for ruling sought. Tex. R.App. P. 33.1(a). After Conde's outburst, in open court, Jabari's attorney moved for a mistrial based on alleged prejudice to the jury from Conde's untranslated and unrecorded emotional statements, which did not constitute testimony. The trial court denied the motion for mistrial. When the jury re-entered the courtroom, the trial court gave a limiting instruction to the jury, telling it to disregard any comments that were not in direct response to a question that was immediately asked.

■ Jabari complains that the trial court did not conduct an inquiry into whether the jurors heard or understood the outburst. He further contends that it was error for the trial court to fail to settle the record as to the off-the-record Spanish outburst, so that Jabari could know what was said and determine whether to cross-examine Conde on her outburst. Jabari, however, failed to present his request to the trial court or obtain a ruling. *See*

Tex.R.App. P. 33.1(a); *Garcia v. State,* 2004 WL 2871750, *14 (Tex.App.-San Antonio 2004, pet. ref'd) (holding that defendant waived any error in failure to translate defendant's wife's out-of-court Spanish statement, overheard by jurors, because defendant did not request an official translation). For inflammatory conduct by a witness to be grounds for error, the appellant has the burden to ensure that the activity of which he complains is made a part of the complete record so that any error is preserved for appeal. *Baker v. State,* 797 S.W.2d 406, 408 (Tex.App.-Fort Worth 1990, pet. ref'd) (holding that any error in failing to grant mistrial based on "inflammatory" conduct was waived because appellant failed to meet burden of ensuring that inflammatory conduct was described in the record). Since Jabari never requested that the court settle the record or translate the Spanish outburst and determine its inflammatory nature, he failed to meet his burden. We hold that any error is waived.

Jabari's failure to secure a translation of Conde's Spanish outburst for the record likewise waives any error that may have arisen from his inability to confront the witness. Jabari's objection to the Spanish outburst never mentioned the Confrontation Clause of the Sixth Amendment, nor did the context of the objection "serve to amply flesh out its meaning," as Jabari suggests in his brief. Finally, Jabari cross-examined the witness after the incident and was never precluded from inquiring about the outburst. Thus, any error on this point was similarly waived.

■ Finally, Jabari contends that the prosecution "made dramatic use of Ms. Conde's hysterical outburst" by arguing in summation that the outburst was prompted by her recognition of Jabari in the courtroom.[2] In support of his argument,

---

2. In closing, the prosecutor argued:

"And did you go home Monday night like

he relies on *Stahl v. State*, 749 S.W.2d 826 (Tex.Crim.App.1988). In *Stahl*, the trial court warned the mother of the victim before her testimony, out of the presence of the jury, that she could not show any emotion when asked to identify her son from a photo taken of him in the morgue. *Id.* at 828. The court held that the prosecutor in Stahl engaged in misconduct by intending an outburst or being indifferent to the risk of one, and by exacerbating the impact on the jury by referencing the mother's grief in his closing argument. *Id.* at 830. *Stahl* discusses three factors to consider in prosecutorial misconduct: (1) whether the defendant objected, (2) whether the prosecutor violated an express court order, and (3) whether prosecutorial conduct was blatant. *Id.* at 831. Here, the prosecution referred to Conde's outburst in her closing arguments. But unlike in *Stahl*, defense counsel did not object, and the prosecutor's statement did not violate an express court order. *Stahl*, thus, is distinguishable, and Jabari waived any error in the closing argument by failing to object.

We hold that Jabari did not properly preserve his complaints on appeal about Conde's outburst.

### Withholding Exculpatory Evidence

Jabari contends that he was denied due process rights because the State or its agents withheld material and exculpatory evidence in violation of its duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). At trial, Conde testified that she made Jabari a sandwich and poured him a glass of juice. Jabari took a bite from the sandwich, and she also thought he took a sip from the glass of juice. Officer Salazar testified that he did not recall seeing a glass on the table with the sandwich. Jabari asserts that Officer Salazar is "disingenuous" in his testimony that he did not recall a juice glass, and that this court must assume that officers collected the glass and tested it for fingerprints. According to Jabari, the fact that no fingerprint evidence from the juice glass was presented at trial "compels the conclusion that this evidence was exculpatory."

To establish a *Brady* violation, a defendant must satisfy three requirements: (1) the State suppressed evidence; (2) the suppressed evidence is favorable to the defendant; and (3) the suppressed evidence is material. *Harm v. State*, 183 S.W.3d 403, 406 (Tex.Crim.App.2006). The *Brady* obligation to disclose evidence generally does not apply to evidence that the State does not possess or does not know to exist. *See Thompson v. State*, 612 S.W.2d 925, 928 (Tex.Crim.App.1981). Furthermore, the State's duty is limited to evidence that has an apparent exculpatory value before it is destroyed, and the appellant must show bad faith on the part of the police. *Hebert v. State*, 836 S.W.2d 252, 253–54 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd). Jabari presents no evidence that the State actually possessed and with-

I did and hear the terror in Beatrice Conde's voice over and over in your mind? When she sat in that chair, very comfortably and looked around the room and didn't think her rapist was here. Because somehow, and you can think it was an accident or you can think it was on purpose, I kind of have my doubts that it was an accident, he was leaned back in his chair just so that his face was concealed by his attorney at the time that I asked her to identify him. And all she could see was just another suit sitting in that chair. And then, in that moment, that brief fleeting moment where somebody moved slightly and she caught sight of him; oh, my God, she saw him. And that little moment of comfort that he wasn't here and all of a sudden seeing him again for the first time, a year later, brought it all back to her. And did the way she reacted make you wonder, what he did to make her scream that way?"

held the glass, that the glass constituted exculpatory evidence favorable to the defendant, or that any bad faith on the part of the police exists. *See Menefee v. State,* 211 S.W.3d 893, 903 (Tex.App.-Texarkana 2006, pet. ref'd) (holding that appellant did not have a valid claim that the State failed to develop evidence that might have been exculpatory because appellant did not show any evidence which was known to the State and not the appellant and was favorable to the appellant); *Pachecano v. State,* 881 S.W.2d 537, 543 (Tex.App.-Fort Worth 1994, no pet.) (holding that appellant made no showing that the evidence in question ever existed, and their existence was denied by the custodian of the evidence, so they could not have been destroyed or preserved).

We hold that Jabari failed to meet his burden to show that a *Brady* violation occurred.

### DNA Evidence and Factual Sufficiency

 Jabari contends that the DNA evidence did not cure the harm caused by the admission of the unadjudicated extraneous offenses and his convictions for rape in California, and that the DNA evidence alone is not factually sufficient to sustain his conviction. Jabari contends that police officer misconduct rendered the DNA evidence unreliable, and he accuses the officers of manufacturing evidence against him. As we have held that the trial court did not err in admitting the extraneous offenses, and that the error in admitting extra detail about his two prior convictions was harmless, Jabari's "harm" argument is irrelevant. Construing this issue as a challenge to the factual sufficiency of the evidence, we conduct a factual sufficiency analysis based on the evidence admitted.

In a factual sufficiency review, we consider all the evidence in a neutral light to determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *Watson v. State,* 204 S.W.3d 404, 414 (Tex.Crim.App.2006). We set the verdict aside only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App.2000). Under the first prong of *Johnson,* we cannot conclude that a verdict is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit had we been on the jury. *Watson,* 204 S.W.3d at 417. Under the second prong of *Johnson,* we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of that conflict. *Id.* Before finding that evidence is factually insufficient to support a verdict under the second prong of *Johnson,* we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.* We must also discuss the evidence that, according to the appellant, most undermines the jury's verdict. *See Sims v. State,* 99 S.W.3d 600, 603 (Tex.Crim.App.2003).

Jabari does not specifically point out any evidence that undermines the jury's verdict. Instead, Jabari claims that Officer Moreno "engineered" and "manufactured" the prosecution against him. He asserts, without support in the record, that the DNA evidence from the sandwich was mishandled. He also argues that the DNA evidence was manufactured because, as a Muslim, he would not have taken a bite of a ham sandwich. These unsupported assertions do not constitute evidence undermining the verdict. Additionally, Jabari argues that the lack of fingerprint evidence from the glass that was not taken into evidence from Conde's apartment, and the fact that Conde saw Jabari only for a few minutes support a finding that the

evidence was factually insufficient. The properly admitted testimony and identifications of Jabari by Beatrice Conde, Maria Pena, and Gemina Guadarrama, and the DNA evidence from the sandwich from Conde's apartment, when viewed in a neutral light, are factually sufficient to support the jury's verdict. The only contrary evidence was Jabari's own testimony in which he denied that he committed the rape, and we leave conflicts in the evidence to the resolution of the jury. *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex.Crim.App. 1999). After reviewing the properly admitted evidence at trial, including the testimony of the complaining witness identifying Jabari and the DNA evidence, we hold that the evidence is not so weak as to be manifestly unjust, nor is the great weight and preponderance of the evidence contrary to the jury's verdict.

## Motion for New Trial

■ Jabari contends that the trial court abused its discretion in not conducting a hearing on his motion for new trial. On November 15, 2007, Jabari, through his court-appointed attorney, timely moved for new trial. In his motion for new trial, Jabari argues that the State withheld evidence in violation of *Brady v. Maryland,* that Officer Moreno engineered the investigation against him, and that Jabari's trial counsel was ineffective for reasons including refusing to use "evidence" of Moreno's bias at trial. The motion for new trial was set for a hearing on December 18, 2007. When the parties appeared in court for the hearing, they learned that Jabari had filed a *pro se* motion to recuse the trial judge. The judge suspended his decision on the motion for new trial pending the decision of another trial court on the motion to recuse. On February 12, 2008, Judge Olen Underwood denied the motion to recuse. At this point, more than 75 days had

elapsed since the motion for new trial was filed, and no hearing had been conducted. Thus, the motion for new trial was deemed overruled by operation of law under Texas Rule of Appellate Procedure 21.7. *See* Tex.R.App. P. 21.7. Jabari now requests that we remand this case so that the trial court may conduct a hearing on the motion for new trial.

■ When reviewing on appeal a trial court's denial of a motion for new trial, the proper standard of review is abuse of discretion. *Wallace v. State,* 106 S.W.3d 103, 108 (Tex.Crim.App.2003); *McIntire v. State,* 698 S.W.2d 652, 660 (Tex.Crim.App. 1985). We review the trial court's denial of a hearing on a motion for new trial by examining "whether the court acted without reference to any guiding rule and principles." *Bruno v. State,* 916 S.W.2d 4, 6 (Tex.App.-Houston [1st Dist.] 1995, pet. ref'd). The right to a hearing on a motion for new trial is not absolute. *Reyes v. State,* 849 S.W.2d 812, 815 (Tex.Crim.App. 1993); *Bruno,* 916 S.W.2d at 8. A defendant has a right to such a hearing when the motion raises matters that cannot be determined from the record. *Reyes,* 849 S.W.2d at 815; *Bruno,* 916 S.W.2d at 8. A trial court abuses its discretion if it fails to hold a hearing when the defendant has a right to a hearing. *Reyes,* 849 S.W.2d at 815; *Bruno,* 916 S.W.2d at 8.

■ Jabari raises claims, like ineffective assistance of counsel and police misconduct, that are not determinable on this record. But to proceed to a hearing, the motion must meet all of the prerequisites for a prima facie showing of new trial grounds. *See Green v. State,* 264 S.W.3d 63, 65–68 (Tex.App.-Houston [1st Dist.] 2007, pet. ref'd). Texas Rule of Appellate Procedure 21 requires that a motion be: (1) timely filed, (2) properly presented, and (3) adequately verified, or that a sworn affidavit (by an inmate) be provided in lieu of verification.[3] *See* Tex.R.App. P. 21.4,

---

**3.** Texas Civil Practice and Remedies Code

Section 132.001 allows an inmate in the Tex-

21.6; *Green,* 264 S.W.3d at 66–68. The affidavit must show specific facts to support the grounds alleged as a basis for new trial. *Reyes,* 849 S.W.2d at 816. Affidavits that are conclusory in nature and not supported by facts are insufficient to put the trial court on notice that grounds for reasonable relief exist. *Jordan v. State,* 883 S.W.2d 664, 665 (Tex.Crim.App.1994).

Jabari's motion for new trial attaches his handwritten statement entitled "Defendant's Official Statement in Support of Motion to Set Aside Conviction and Grant a New Trial." In this document, Jabari should have sworn to specific facts to support a motion for new trial. *See Torres v. State,* 4 S.W.3d 295, 296–97 (Tex.App.-Houston [1st Dist.] 1999, no pet.) (holding that appellant's affidavit was sufficient because appellant claimed, among other things, that his lawyer (1) persuaded him to plead guilty without an agreed sentencing recommendation, (2) told him he would probably get probation or boot camp, and (3) told him he would receive immunity from prosecution for any unadjudicated extraneous offenses.) Instead, Jabari's statement is general rhetoric, asking the trial court to invoke its sense of "fair trial" and "law and order." He does not include any facts to support the allegations of ineffective assistance and police misconduct in his motion for new trial. We hold that Jabari's affidavit in support of his motion for new trial is insufficient to warrant a hearing because it is conclusory and without any factual support. *See Jordan,* 883 S.W.2d at 665. Thus, the trial court did not abuse its discretion in allowing the motion to be overruled by operation of law.

**Conclusion**

We hold that the trial court did not abuse its discretion in admitting the evidence of the extraneous unadjudicated offenses to prove identity, and Jabari did not properly preserve for appellate review any error arising from the complainant's unrecorded Spanish outburst on the witness stand. We further hold that Jabari failed to adduce any facts showing that his complaint that the State withheld exculpatory evidence and thus violated its duty under *Brady v. Maryland* has merit. Finally, we hold that the evidence is factually sufficient to support the verdict, and the trial court did not err in allowing Jabari's motion for new trial to be overruled by operation of law. Accordingly, we affirm the judgment of the trial court.

as Department of Criminal Justice or in a county jail to make an unsworn declaration in lieu of a written, sworn declaration, as long as it meets the requirements in Section 132.002, which requires that it be in writing and subscribed by the person making the declaration as true under the penalty of perjury, and it be substantially in the form as set out by Section 132.003. TEX. CIV. PRAC. & REM.CODE ANN. §§ 132.001–.003 (Vernon 2005); *see Owens v. State,* 763 S.W.2d 489, 490 (Tex.App.-Dallas 1988, pet. ref'd); *Green v. State,* 264 S.W.3d 63, 66–68 (Tex.App.-Houston [1st Dist.] 2007, pet. ref'd).