**Opinion issued July 7, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00279-CR

————————————

**JOSEPH JUAN FACUNDO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

═══════════════════════════════════════════════════════

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1344346**

═══════════════════════════════════════════════════════

## MEMORANDUM OPINION

A jury convicted appellant, Joseph Juan Facundo, of capital murder, and, because the State did not seek the death penalty, the trial court assessed punishment at confinement for life. We affirm.

# BACKGROUND

On the evening of December 20, 2011, Russell Lopez was at home taking care of his seven-year-old son, Caden, his six-year old niece, Bailey, and his nine-month-old daughter, Julianne. Lopez's wife, Marie, and his cousin, Shonte Mabe, were at work together. When they got off work shortly after 9:00 that night, Marie tried calling Lopez twice, but was unable to reach him. Mabe gave Marie a ride home. When they pulled up to Marie's house, they noticed that Lopez's black Tahoe was not in the driveway.

Upon entering the home, they found that their house had been ransacked and Marie's nine-month-old daughter was sitting on the couch unattended. Lopez was found lying on the bedroom floor covered in blood. While Mabe called 911, Marie went to Caden's bedroom to check on the children. Marie found the children in Caden's bedroom. Both Caden and Bailey were unharmed, but their hands and feet had been bound together. While Marie was in the children's bedroom, the 911 dispatch operator instructed Mabe to confirm that Lopez was not breathing. Lopez's face was so distorted that he was unrecognizable. Due to the severe nature of the injuries to Lopez's face, Mabe was unable to perform CPR.

Paramedics arrived and declared Lopez dead on the scene. A sword was lying across his left chest and arm. There was a large concentration of blood on the floor of the dining room area, as well as bloody trails on the carpet leading to Lopez's

body, indicating that his body had been dragged from the dining room to the bedroom. Various items had been removed from the home, including a television, a game system, jewelry, and Lopez's vehicle.

Sergeant Craig Clopton, an investigator for the homicide unit at the Harris County Sheriff's Office, spoke with people in the neighborhood and developed two potential suspects, Amber Thornton and appellant. On December 28th, Clopton interviewed Thornton, who voluntarily consented to the interview, at the homicide department. Based on the information he received from Thornton, Clopton also developed Tony Escobar as a suspect.

Clopton produced photo arrays containing pictures of the three suspects and showed them to Caden. Caden identified appellant. Clopton then sought capital murder charges against appellant, and an arrest warrant was issued for his arrest.

On December 30th, 2011 appellant was apprehended in Laredo, where he was attempting to cross the border into Mexico.

*Appellant's Trial*

At appellant's trial, Thornton testified as a witness for the State. According to Thornton, Lopez was the neighborhood drug dealer. On the evening of December 20, 2011, Thornton went to the vacant house next door to her home to get high. She found that Escobar and appellant were already at the vacant house. Thornton testified that they spent the next 30 minutes discussing a plan to rob Lopez to get money and

drugs. They planned to enter Lopez's home under the pretense of selling him a laptop, which Escobar had brought to the vacant house, in exchange for three bags of cocaine worth $20.00 each. Once inside, appellant would hit Lopez over the head with a hammer, Escobar would tie up the children, and they would steal Lopez's property and his Tahoe.

Appellant called Lopez and arranged for the "sale" of the laptop. Then they walked to Lopez's house, and he let them inside. Appellant was carrying the hammer in his pocket. Thornton testified that Lopez was sitting at the dining room table feeding his infant daughter. Caden and Bailey were also present, but Lopez told them to go to the back room. Appellant and Escobar set the laptop on the table and grabbed the cocaine. Then appellant pulled the hammer out of his pocket and struck Lopez about 10 times in the back of the head. Lopez fell to the ground, and appellant continued to repeatedly strike him with the hammer.

Thornton testified that the baby began crying, so she picked her up from the highchair and held her while Escobar went to Caden's room and tied up the other children. Appellant, Thornton, and Escobar started grabbing televisions, guns, electronics, drugs, and money. Appellant and Escobar loaded the stolen items into Lopez's Tahoe, while Thornton held the baby. Appellant and Escobar grabbed Lopez by the hands and dragged his body into the bedroom. Then, appellant retrieved an ornamental sword from Lopez's bedroom. Appellant and Escobar were standing

4

over Lopez's body, and appellant was about to stab Lopez with the sword, when he told Thornton to look the other way. Appellant, along with Thornton and Escobar, drove the Tahoe to the vacant house and hid the stolen property in the attic. They discarded the Tahoe at a lake known locally as "The Cliffs."

Sergeant C. Clopton testified as a witness for the State. Clopton testified that he contacted the Webb County Jail after discovering that appellant was detained in Laredo. Clopton called to inquire if the jail was equipped to record inmates' telephone conversations. When he learned the jail recorded appellant's telephone conversations, he requested a copy of the recordings to further investigate Lopez's murder.

Lieutenant A. Vera also testified as a witness for the State. Vera was custodian of records for the Webb County Jail at the time appellant was detained there. Clopton coordinated with Vera to obtain appellant's recorded telephone conversations. Vera testified that the jail uses a system called Intel to record and log phone calls made by inmates. Before making a call, inmates are prompted with a recording that informs them the call will be monitored. The State presented State's Exhibit 111 as evidence, which was a CD of recorded conversations that appellant made while housed at the Webb County jail. In the recorded conversations with friends and family members, appellant is heard repeatedly protesting his innocence, pleading

with his mother to hire him a lawyer, and talking about his alibi.[1] Defense counsel objected to the recordings based on a violation of the Fifth Amendment and the fact that appellant "is in custody at that point." The trial court overruled appellant's objection to the admission of the recordings.

The State also presented State's Exhibit 3, an EMS report that was created by the paramedic who responded to the scene and found Lopez dead. The report was authored by Dawn Visneau, an assistant chief of Emergency Medical Services and the supervisor on duty when EMS responded to the call at Lopez's home. When it was offered into evidence, appellant objected to the report's narrative portion, which described the physical condition of the victim's body and the appearance of the house in which was discovered, as inadmissible hearsay within hearsay. The trial court overruled appellant's objection.

Archie Woods, appellant's cellmate in the Harris County Jail, testified that appellant told Woods that he was in jail for capital murder because he had hit a man in the head with a hammer during a home invasion seeking drugs and money. Appellant described his co-actors as a man and a woman and talked about a sword being involved. Appellant also told Woods about how he was arrested while

---

[1]    Appellant is heard telling family members to find "Blinky," who could tell police that he was with appellant and Escobar at the bayou at the time of the murder.

attempting to cross the border into Mexico.  Finally, Woods testified that appellant's

nickname in jail was "Hammer."

Sergeant Clopton also testified about a conversation he had with Jimmy

Whalen, also known as "Blinky," wherein Whalen told him that appellant had asked

him to lie and be his alibi.  This evidence was admitted after Whalen denied at trial

that such a conversation ever took place.

The jury found appellant guilty of capital murder as charged in the indictment.

**ADMISSION OF RECORDED TELEPHONE CONVERSATIONS**

In four related issues on appeal, appellant contends the trial court erred by

admitting evidence of jailhouse telephone calls that he made to friends and family.

Specifically, appellant presents the following issues:

1.      Whether a defendant's constitutional right to counsel under the
Fifth Amendment is violated when he is discussing retaining an
attorney with his family on a jail house phone call that is recorded by
the State and is used against him as evidence at trial?

2.       Whether a defendant's constitutional right to counsel under the
Sixth Amendment is violated when he is discussing retaining an
attorney with his family on a jail house phone call that is recorded by
the State and is used against him as evidence at trial?

3.      Whether a defendant's due process rights are violated when he is
discussing retaining an attorney with his family on a jail house phone
call that is recorded by the State and is used against him as evidence at
trial?

4.       Whether overruling as untimely an objection to an exhibit
constitutes error when the exhibit was objected to prior to being

admitted and then further objected to on additional grounds before it was published to the jury?

The State responds that only appellant's Fifth Amendment claim was preserved for review because appellant's Sixth Amendment and Due Process objections were untimely. Thus, we begin by addressing appellant's fourth issue.

### *Standard of Review and Applicable Law*

We review a trial court's decision to admit evidence for an abuse of discretion. *Castrejon v. State*, 428 S.W.3d 179, 184 (Tex. App.—Houston [1st Dist.] 2014, no pet.). We will not reverse a trial court's evidentiary ruling unless it falls outside the zone of reasonable disagreement. *Id.*

An objection is timely if it is raised as soon as the ground objection becomes apparent, or otherwise the matter is forfeited. *Johnson v. State*, 878 S.W.2d 164, 167 (Tex. Crim. App. 1994). To preserve error for appellate review, the complaining party must make a specific objection and obtain a ruling on the objection. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). The objection must be made at the earliest possible opportunity. *Id.*

### *Timeliness of Sixth Amendment and Due Process Objections*

When the State offered the recorded telephone conversations into evidence during direct examination of witness Lieutenant Vera, appellant initially made objections as to 1) the lack of authentication of the recordings, and 2) the legality of intercepting and recording an inmate's telephone conversations (presumably, a

Fourth Amendment objection). Both objections were overruled by the court.

Immediately thereafter, appellant made an objection to admission of the recordings grounded upon a violation of the Fifth Amendment. Defense counsel did not give specific grounds for the alleged violation other than that appellant was in custody when the conversations were recorded. The exchange occurred as follows:

> [Defense counsel]: I need to put on the record, notwithstanding the Court's ruling, I forgot to add the violation of the Fifth Amendment. He's in custody at that point.
>
> [The State]: He is not subject to counsel on recorded phone calls. He has no right to privacy to that conversation in jail, and the State would assert there's no Fifth Amendment violation.
>
> [Trial Court]: I understand.
>
> [Defense counsel]: Same ruling, I understand. I just want the record to reflect.

After an off the record discussion, the Court ruled on appellant's Fifth Amendment objection as follows:

> [Trial Court]: Objection is overruled. It will be admitted.
>
> [The State]: Your Honor, I'll ask for permission to publish at a later time.
>
> [Trial Court]: Sure.

Later that afternoon, the Court recessed for the day and announced that proceedings would resume the following morning. When the trial resumed the next day, and before the jury was empaneled, appellant made a second objection

grounded upon a violation of the Fifth Amendment as follows:

> [Defense counsel]: Your Honor, prior to State's Exhibit 111 being published or played in the presence of the jury, I would object to those portions of those conversations between my client and family members that deal with specifically his parents' efforts at retaining counsel on his behalf, his admonitions or warnings from his mother about not talking to law enforcement and everything pertaining to that subject matter of representation and counsel and his need not to talk to anyone, his need to immediately invoke his rights to counsel, and that whole line of conversation as being irrelevant. And since these are post arrest statements, a jury could hear that to potentially infer comments on his post-arrest right to silence. It is tantamount to an implicit suggestion perhaps of his guilt, and I just think it's irrelevant, inflammatory, and prejudicial.
>
> [Trial Court]: I'll overrule the objection.

Thereafter, the State noted for the record that State's Exhibit 111 had already been entered into evidence earlier in the trial and that the recordings should come in in its entirety. The court responded:

> [Trial Court]: I'll overrule the objection. I just think it's not timely.

The State argues that appellant's Sixth Amendment and Due Process objections [if indeed those are the bases for appellant's renewed objections] were untimely because the evidence had already been admitted the previous day, even though the jury had not yet heard it. We agree.

In *Castrejon*, the State moved to admit a recording, and the appellant objected based on the lack of a certified interpreter. 428 S.W.3d at 186. The trial court overruled the objection, and the recording was admitted, but not published to the

10

jury at that time. *Id*. At closing argument, when the State requested to publish the recording to the jury, appellant objected based on a different ground, i.e., the lack of a written transcript. *Id.* This Court held that the new objection, made after admission of the evidence, but before publication to the jury, came too late to preserve error. *Id.* The same is true here. Appellant's Due Process and Sixth Amendment objections came the day after the evidence was admitted at trial, and, as such, were not "made at the earliest possible opportunity." *Wilson*, 71 S.W.3d at 349. Therefore, we conclude that the trial court did not abuse its discretion when determining that appellant's Due Process and Sixth Amendment objections were untimely.

We overrule point of error four. Because appellant's Due Process and Sixth Amendment objections were untimely, we also overrule points of error two and three.

### *Fifth Amendment Objection*

In point of error one, appellant claims the trial court erred in admitting the recorded telephone conversations. Specifically, appellant argues that admission of the recordings violated his Fifth Amendment right against self-incrimination because he was entitled to have counsel present during custodial interrogation. Appellant further claims that the statements he made on the phone calls were the product of custodial interrogation because they were captured by a system

specifically designed to record the conversation of a defendant in police custody. Appellant's argument is without merit.

Although appellant was in custody, the recorded statements that he made over the jail phone were not made in response to interrogation by law enforcement. *See State v. Scheineman*, 77 S.W.3d 810, 813 (Tex. Crim. App. 2002) (en banc) (observing that no custodial interrogation occurred when the defendant's custodial statement was not made in response to interrogation by law enforcement personnel but instead was made when the defendant was alone with a co-defendant); *see also Banargent v. State*, 228 S.W.3d 393, 402 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (holding that recordings of telephone calls made by defendant from prison were not product of custodial interrogation.).

Because there was no custodial interrogation, the trial court did not err in overruling appellant's Fifth Amendment objection. Accordingly, we overrule point of error one.

## *BATSON* CHALLENGES

In points of error five and six, appellant contends that the trial court erred in denying his *Batson* challenge that he raised during voir dire in violation of Texas Code of Criminal Procedure article 35.261 and *Batson v. Kentucky*.[2] Appellant argues that the State's use of peremptory challenges against two venire members,

---

[2] 476 U.S. 79, 106 S. Ct. 1712 (1986).

both of whom were Hispanic, was racially motivated.  Specifically, appellant brings

the following issues:

> 5.      Whether striking a Hispanic venire person based on his opinion of law enforcement in the neighborhood where the venire person lives resulted in a statutorily prohibited race based peremptory challenge in violation of Texas Code of Criminal Procedure 35.261?

> 6.      Whether striking a Hispanic venire person based on his opinion of law enforcement in the neighborhood where the venire person lives resulted in a statutorily prohibited race based peremptory challenge in violation of Batson v. Kentucky?

## *Standard of Review and Applicable Law*

In *Batson*, the United States Supreme Court held that the prosecution is

forbidden from exercising peremptory strikes based solely on the race of the

potential venire member.  476 U.S. at 86, 106 S. Ct. at 1717. To succeed on a *Batson*

challenge: First, the defendant makes a prima facie case that a venire member was

excluded on the basis of race. *Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App.

2001). Second, the State must come forth with race-neutral reasons for exercising

the peremptory challenge. *Id.* The defendant has the opportunity to rebut those

reasons. *Id.* The burden of persuasion remains with the defendant. *Id.* "The ultimate

plausibility of that race-neutral explanation is to be considered as part of the third

step of the analysis, in which the trial court determines whether the opponent of the

strike (usually the defendant) has satisfied his burden of persuasion to establish by a

preponderance of the evidence that the strike was indeed the product of the

proponent's purposeful discrimination." *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008) (citing *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771 (1995)).

The determination of whether the State's explanation is a pretext "is solely a question of fact; there is no issue of law." *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004). Because the trial court's fact finding will be based on factors not evident in the record, its decision is accorded great deference and will not be overturned unless it is clearly erroneous. *Id*; *see Jasper*, 61 S.W.3d at 421–422.

Appellant concedes that the State gave a race-neutral reason for the use of its peremptory strikes, but argues that its reason was pretextual and not supported by the record.

*Analysis*

After venire members were struck for cause, and after each side made its peremptory challenges, but before the jury was empaneled and sworn in, defense counsel made an oral *Batson* motion, arguing that appellant was Hispanic and the State struck "66% or two-thirds of the Hispanics on this panel." Appellant challenged the State's peremptory strikes regarding venire members 26 and 34, claiming that they were racially motivated. The State responded that, among other reasons, venire members 26 and 34 were struck because of their negative view of law enforcement.

The record shows that the State asked the venire the following question:

Now I'm going to ask everyone's opinion of law enforcement. We're going to go down the list again, 1 through 65. Obviously, one is thumbs down. Four is thumbs up. And this is your opinion of law enforcement in your community where you live.

Both venire members 26 and 34 rated their opinion of law enforcement at a 2. Appellant now claims the question was a method of racial discrimination because it inquired into the venire members' opinion of law enforcement *in the community where they live*. In his appellate brief, appellant argues:

Since it is not uncommon for people of similar race, nationalities, cultures and/or backgrounds to live in the same area and share similar opinions, including opinions about law enforcement, the answer solicited resulted in the same outcome as if the State would have asked, "In your Hispanic neighborhood, what is your opinion of law enforcement?"

However, appellant's argument assumes that all Hispanic individuals reside in ethnically segregated communities. Further, the record shows that defense counsel identified venire member 38 as a third Hispanic individual who remained on the panel. Venire member 38 answered "3" in response to the question regarding law enforcement. Had the State intended to strike all Hispanic venire members, the State could have struck venire member 38 because it only used nine out of ten of its peremptory challenges. Nonetheless, venire member 38 was not struck from the panel. The State's failure to strike venire member 38 is some evidence that the State was willing to accept Hispanics who had a more positive view of law enforcement.

15

Thus, this supports the trial court's finding that venire members 26 and 34 were struck by the State based on their view of law enforcement, and not on the fact that they lived in Hispanic communities. Indeed, the record shows that, after strikes for cause were made, the State struck all remaining venire members who evaluated law enforcement at a two or less.

Having reviewed the entire record, we conclude the trial court's decision to deny appellant's *Batson* motion was not clearly erroneous. The State provided a racially-neutral explanation for its use of peremptory challenges, and appellant failed to carry his burden to show that the stated reason was pretextual. The trial court was in the best position to assess the genuineness of the State's assertions regarding the strikes. Such an assessment would rely on a number of intangible judgments made by the trial court. *See Miller–El v. Cockrell*, 537 U.S. 322, 339, 123 S. Ct. 1029, 1040–41 (2003). Giving, as we must, deference to the trial court's ruling, we do not have a "definite and firm conviction that a mistake has been committed." *See Guzman v. State*, 85 S.W.3d 242, 254 (Tex. Crim. App. 2002).

We overrule points of error five and six.

## HEARSAY

In point of error seven, appellant contends that the trial court abused its discretion by admitting State's Exhibit 3, a report prepared by an Emergency Medical Services paramedic, which contains a narrative portion indicating the

supervisor's observations of the scene. Specifically, appellant brings the following issue:

> 7. Whether a business record that contains hearsay within hearsay is erroneously admitted into evidence when each part of the hearsay within hearsay fails to conform with an exception to the hearsay rule as required by Texas Rules of Evidence 805?

### *Standard of Review and Applicable Law*

We review the trial court's admission of evidence for abuse of discretion. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Ford v. State*, 179 S.W.3d 203, 210 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action; rather, it is a question of whether the trial court acted without reference to any guiding rules or principles. *Hernandez v. State*, 53 S.W.3d 742, 750 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd).

### *Analysis*

Appellant contends State's Exhibit 3, the report prepared by an Emergency Medical Services paramedic, contains a narrative portion indicating the supervisor's observations of the scene, which contains hearsay within hearsay. The narrative portion of the report reads:

> Upon arrival PT presented supine in bedroom of home. PT was covered in blood, Pulse less and Apneic. PT was cold and cyanotic with lividity. PT had sword laying across his left chest and left arm. PT had brain

matter and skull fragments beside his body. PT had laceration to the right chest and throat. PT. had penetrating trauma to right cheek esposing bone and tissue. 6 second strip performed showing Astyote. PT pronounced DOS due to unknown downtime and injuries incompatible with life. House had blood splatter on ceiling of bedroom just above the body as well as in living room and kitchen. Kitchen pantry had copious amounts of coagulated blood on floor. House appeared to be ransacked as TV in bedroom was upside down on floor. Drawers in living room and bedroom were overturned. TV in living room was missing. PT family was taken to back bedroom awaiting SO arrival. Upon arrival of SO report given to officer. Assistant chief and Medic 41 remained on scene to give report to homicide detective.

Appellant bases his complaint on Rule of Evidence 805, which provides, in relevant part:

> Hearsay within Hearsay: Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.

Even when a document is admissible under an exception to the hearsay rule, portions of its contents nonetheless may remain hearsay. *See* TEX. R. EVID. 805; *see also Texas Worker's Comp. Comm'n v. Wausau Underwriters Ins.*, 127 S.W.3d 50, 61 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("Even though a document is admissible pursuant to a hearsay exception, further objections to hearsay contained within the document must be examined separately.").

Here, the State proffered the report as a business record, exempt from the hearsay rule. *See* TEX. R. EVID. 803(6). Appellant argued the narrative portion of the report, which described the EMT's observations of the crime scene, was hearsay within hearsay, and should have not been admitted, even though the EMT report

18

itself was admissible under the business record exception.

Assuming, without deciding, that the EMT report contained hearsay within hearsay, we conclude that its admission was harmless error. Admitting evidence in violation of a rule of evidence is considered non-constitutional error. *See* TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *Jabari v. State*, 273 S.W.3d 745, 754 (Tex. App.—Houston [1st Dist.] 2008, no pet.). We disregard any non-constitutional error that does not affect a defendant's substantial rights. *Jabari*, 273 S.W.3d at 754. "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Id.* (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)). We should not reverse a conviction for non-constitutional error if, after examining the record as whole, we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Id.* (citing *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

In making this determination, we consider the entire record, including any testimony and physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). The weight of evidence of the defendant's guilt is

relevant in conducting the harm analysis under rule 44.2(b). *Neal v. State*, 256 S.W.3d 264, 285 (Tex. Crim. App. 2008); *Motilla*, 78 S.W.3d at 356–57.

After examining the record as a whole, we are fairly assured the error did not have a substantial and injurious effect or influence in determining appellant's conviction. *See Jabari*, 273 S.W.3d at 754. Here, there was copious other evidence presented about the condition of the complainant's body, that a sword was used, that the house had been ransacked, and that items were missing from the house. The narrative portion of the EMT statement provided no significant information that was not otherwise available to the jury, and nothing in it points to appellant as the murderer. A trial court's error in admitting evidence is harmless error when similar facts are proved by other properly admitted evidence. *See Bourque v. State*, 156 S.W.3d 675, 677 (Tex. App.—Dallas 2005, pet. ref'd) (concluding that admission of hearsay was harmless because considerable, substantially similar evidence was presented during trial); *see also Duncan v. State*, 95 S.W.3d 669, 672 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (concluding that improper admission of hearsay was harmless because similar testimony was admitted through complainant, medical records, and other witnesses).

And, there was significant other evidence establishing appellant's guilt, including his co-defendant's testimony, Caden's identification of appellant, the fact that appellant was caught while attempting to flee to Mexico, and appellant's

jailhouse confession to his cellmate.  The weight of evidence of the defendant's guilt is relevant in a harm analysis. *Neal*, 256 S.W.3d at 285.

Because the admission of Exhibit 3 was harmless, we overrule appellant's seventh issue on appeal.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Justices Radack and Justices Keyes and Higley.

Do not publish.  TEX. R. APP. P. 47.2(b).