**Opinion issued December 5, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00279-CR

———————————

**JAMES HAROLD THOMAS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 176th District Court**
**Harris County, Texas**
**Trial Court Case No. 1197921**

---

### MEMORANDUM OPINION

A jury convicted appellant James Harold Thomas of aggravated assault with a deadly weapon. *See* TEX. PENAL CODE ANN. §§ 22.01(a), 22.02(a)(2) (West 2011). Thomas pleaded true to two enhancement allegations, and the trial court

assessed punishment of 15 years in prison. On appeal, Thomas raises two issues, arguing that the trial court erred by admitting evidence of two prior criminal convictions during the guilt-or-innocence phase of trial and by failing to limit the definition of "knowingly" in the jury charge to the pertinent conduct of the underlying offense of aggravated assault.

Finding no harm sufficient to require a reversal, we affirm.

## Background

Honey Gray was waiting for a bus with her young sons when she saw a man she did not know cross the street. It was a weekday evening in January, and the sun had already set. The man, identified at trial as appellant James Thomas, walked behind Gray and her sons, spit on the ground, walked farther away, and then stared at Gray and the boys, who boarded the bus. Near the back of the bus was a machine that allows passengers to reload electronic fare cards. The boys took a seat behind the machine while Gray reloaded her fare card. She then walked to the front of the bus to pay the fare. As she returned to the rear of the bus, she saw Thomas, who was sitting near her children, speaking to them. Gray asked Thomas not to speak to her children, and he replied, "I know your kids. They make fun and pick with me all the time."

Gray was frightened by Thomas, and she instructed her sons to move to another seat. She moved toward the back of the bus without threatening Thomas in

2

any way. A woman seated nearby stood up between them, raised her hands defensively, and told Thomas to leave Gray and her children alone. Thomas shoved the woman, who shoved him back, pushing him into a seat. Gray later testified neither that woman nor anyone else moved toward Thomas or tried to hit him after he fell into the seat. But Thomas got up and started to push the woman again, as if "he wanted to fight."

Thomas then opened his coat and removed a knife that Gray described as "a homemade shank." She screamed, "He has a knife." As Thomas brandished the knife in her direction, Gray grabbed the other woman's coat "to pull her back." The bus driver observed through his rearview mirror that Thomas was wielding a knife in a stabbing motion. At trial, Gray said that based on the way he wielded the knife directly at her and the other woman, Thomas was trying to stab someone and intended to do bodily harm. Gray did not realize she had been cut until she felt something dripping down her face and heard her children screaming. She looked into a mirror and saw a gash on her face.

The bus driver stopped the bus, and everyone got off. An ambulance arrived and took Gray to the hospital. Thomas made no attempt to flee; rather, he remained near the bus. Police arrived within minutes, and Metro Police Department Officer J. Wiggins, who was first on the scene, asked who had the knife. The passengers pointed to Thomas. Wiggins approached Thomas, patted

3

him down, and found a knife in his pocket. The officer placed Thomas under arrest.

Metro Police Department Officer M. Stoneham arrived later. Stoneham searched Thomas and put him in his patrol car. Wiggins gave Stoneham the knife. At trial Gray testified that this knife was the one she saw Thomas use on the bus, and Stoneham identified it as the knife that Wiggins gave him.

Stoneham testified that he had been trained to deal with mentally ill people. He did not notice anything about Thomas's behavior or appearance that warranted mention in the offense report. Thomas was cooperative and did not blurt out any remarks or statements. Gray testified similarly about Thomas's demeanor, saying that his speech was not slurred and he was not "talking gibberish."

Thomas was charged with aggravated assault, but trial of his case was delayed and reset several times due to concerns about his mental health, sanity, and competency to stand trial. He was initially found incompetent to stand trial, and he received treatment for his mental illness in two state hospitals. He was tried three years after the offense, when he was determined to be competent to stand trial and sane for the purposes of a criminal prosecution.

At trial, his counsel's defensive theory was that Thomas was not guilty by reason of insanity. The trial record shows numerous outbursts from Thomas, who often blurted out that he was not insane. His counsel made a record of the

4

meandering and confusing notes that Thomas wrote to him during trial. Relying primarily on the notes and letters he received before and during trial, counsel argued that Thomas was incompetent to stand trial. The court denied his request to admit Thomas's mental-health medical records into evidence. However, in an attempt to prove the insanity defense, Thomas's attorney called as a witness Dr. Laval, a psychologist who had examined him.

Dr. Laval testified that he had examined Thomas twice in 2011 to determine his sanity. He met with Thomas for face-to-face interviews on two separate occasions, and he reviewed various medical records, some of which indicated he had been treated for mental illness as far back as the 1970s. Thomas's records also showed that he was treated at state hospitals for schizophrenia for more than a year between his arrest and trial. Dr. Laval testified that schizophrenia is a chronic, psychotic disorder, which is treatable but incurable. He explained the symptoms of schizophrenia include paranoid thoughts, delusions, hallucinations, and tangential thought process. He testified that a person having a schizophrenic delusion might believe a person is trying to hurt him when in fact the person is not doing so. However, when a person with schizophrenia is not experiencing a psychotic episode, he may speak normally and have logical thought processes.

Dr. Laval testified about the nature of a sanity evaluation, which seeks to determine "whether there was anything discussed in the offense report that would

5

obviously render this person illogical, insane, or psychotic at the time of the alleged offense, or whether that is not included." He testified that Thomas informed him that he was homeless and not taking medication for his schizophrenia in 2009 when he assaulted Gray on the bus. Dr. Laval surmised that Thomas may have been experiencing some hallucinations at the time of the offense. Dr. Laval concluded that at the time of the offense, Thomas was under the influence of a psychotic episode, was suffering from a severe mental illness, and may not have been able to control his impulses and conform his behaviors to the requirements of law. Dr. Laval said that Thomas told him that Gray was bothering him, he felt harassed, and he believed he was acting in self-defense.

Nevertheless, Dr. Laval concluded that Thomas's severe mental illness did not prevent him from understanding that his actions were wrong. Based on this, Dr. Laval concluded that Thomas had schizophrenia but nevertheless was sane at the time of the offense and during both of their interviews, in part because Thomas attempted to justify his actions by claiming he acted in self-defense.

Thomas steadfastly expressed his belief that he was not insane at the time of trial or at the time of the offense, and he chose to testify against the advice of his counsel. Outside the presence of the jury, defense counsel objected to the State's intention to impeach Thomas with evidence of two prior convictions: a murder conviction from 1980 and a misdemeanor conviction for unlawfully carrying a

6

weapon in 1998. The court did not immediately rule on these objections and stated it would consider them depending on Thomas's testimony.

Thomas testified that he was a 66-year-old military veteran. When asked if he had been staying in the Harris County jail, he said, "Yes, sir. First time." He testified that he had been staying in a mental health clinic in the Harris County jail, and he had received medication there to treat paranoid schizophrenia. Prior to the offense and since he was "discharged from prison June 14, 2003," he had been living at the YMCA. He also said that he spent time at the public library where, "They know me real good. I don't cause no trouble."

The account he gave of what happened on the day of the offense differed from the account offered by Gray. Thomas admitted speaking to the children, and he explained that he felt they were not being properly supervised and were in some danger because they were playing too near the street. He said he got on the bus to avoid the woman and her children, and once he was on the bus several people attacked him, physically restraining and assaulting him and threatening to maim him with a knife. He admitted to having and using a knife, but he said he did not brandish it until after the people assailed him. He repeatedly asserted that he was not the first aggressor. He admitted cutting a woman on the day in question, but he did not recognize Gray as the woman he cut.

7

Thomas acknowledged that it would be wrong to threaten or cut someone with a knife unless he felt threatened by another's "use of deadly force." He also admitted that he intended to hurt the woman he cut with the knife. He said he was emotionally distressed because he "had been hurt in the past."

Before the State began cross-examination, the prosecutor approached the bench and argued that the prior convictions were relevant. The State was permitted to ask Thomas if he had been convicted of the two prior offenses, which he admitted. When the State began questioning Thomas as to the facts of the misdemeanor conviction, the court sustained Thomas's objection and instructed the jury to disregard the question and Thomas's answer. The court denied Thomas's request for a mistrial.

The jury found Thomas guilty of aggravated assault. Thomas waived a jury as to sentencing and pleaded true to two enhancements alleged by the State. The court assessed his punishment at 15 years in prison, and Thomas appealed.

## Analysis

### I.  Admission of evidence of extraneous offenses

In his first issue, Thomas argues that the trial court erred by allowing the State to cross-examine him during the guilt-or-innocence phase of trial about two prior criminal convictions. We review a trial court's admission of extraneous offense evidence under an abuse of discretion standard. *De La Paz v. State*, 279

8

S.W.3d 336, 343 (Tex. Crim. App. 2009). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *Id.* at 343–44 (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990)).

Outside the presence of the jury, Thomas informed the court that he wished to testify, despite his attorney's advice to remain silent. The State informed the court that it wished to impeach Thomas regarding a prior murder conviction and a prior misdemeanor conviction for unlawfully carrying a weapon. Thomas objected on the grounds that the 1980 murder conviction was too remote to be admissible. *See* TEX. R. EVID. 609(b). Moreover, he argued that admission of the murder conviction would be highly prejudicial and would improperly influence the jury to make its decision on an emotional, rather than evidentiary, basis. *See* TEX. R. EVID. 403. With respect to the State's use of the 1998 misdemeanor conviction of unlawfully carrying a weapon, Thomas argued that it was inadmissible for impeachment purposes because it was neither a felony nor a crime of moral turpitude. *See* TEX. R. EVID. 609(a). The court did not rule on the objections at that time but said that it would consider the objections and apply the Rule 403 "balancing test" after hearing Thomas's testimony.

When a defendant testifies at trial, he is subject to cross examination in the same manner as any other witness. *Bowley v. State*, 310 S.W.3d 431, 434 (Tex.

9

Crim. App. 2010). Rule 609 of the Texas Rules of Evidence provides that evidence of a witness's prior conviction of a felony or crime of moral turpitude shall be admitted for purposes of impeachment if the court determines that the probative value of admitting the conviction outweighs its prejudicial effect. TEX. R. EVID. 609(a); *Morris v. State*, 67 S.W.3d 257, 263 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). The court must balance probative value and prejudice by considering (1) the prior conviction's impeachment value; (2) its temporal proximity to the crime on trial, and the defendant's subsequent criminal history; (3) the similarity between the prior offense and the present offense; (4) the importance of the defendant's testimony; and (5) the importance of the credibility issue. *Theus v. State*, 845 S.W.2d 874, 880 (Tex. Crim. App. 1992); *see Hernandez v. State*, 976 S.W.2d 753, 755 (Tex. App.—Houston [1st Dist.]), *pet. ref'd*, 980 S.W.2d 652 (Tex. Crim. App. 1998). However, when the conviction is more than 10 years old, Rule 609(b) requires the court to conduct a different analysis. *Hernandez*, 976 S.W.2d at 755. In such a situation, before a court may admit such evidence, it must determine that "the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." TEX. R. EVID. 609(b). This ten-year period is measured from the date of trial in which the prior conviction is to be offered as evidence, rather than the date of the charged offense, because the evidence is relevant under Rule 609, if at all, to show whether

10

the defendant is credible at trial. *See Davis v. State*, 545 S.W.2d 147, 150 (Tex. Crim. App. 1976).

As to the murder conviction, Thomas argues that more than 10 years had passed from both the date of conviction and the end of his confinement because he was sentenced to 20 years in prison in 1980, and his trial was in 2012. He therefore contends that the murder conviction should have been evaluated under Rule 609(b) and that its probative value had to substantially outweigh its prejudicial effect. However, at trial Thomas testified that he was released from prison in 2003, and at a pretrial hearing he informed the court that he did 30 years "in and out" on his murder charge. The State concedes that more than 10 years had passed since Thomas's murder conviction, but it argues that if Thomas had been released on parole and had such parole revoked, it is possible that his confinement could have extended into 2002, bringing the murder conviction within Rule 609(b)'s 10-year time limit. The State further argues that the *Theus* factors weigh in favor of admission of the murder conviction, pursuant to Rule 609(a).

We ultimately need not determine the evidentiary issue presented under Rule 609, because even if the court erred by admitting evidence of Thomas's murder conviction, we conclude that the admission of the evidence was not harmful in the circumstances of this case.

The erroneous admission of evidence is subject to a harm analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure. *Jabari v. State*, 273 S.W.3d 745, 754 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Under Rule 44.2, we disregard any non-constitutional error, defect, irregularity, or variance that does not affect substantial rights. TEX. R. APP. P. 44.2(b); *Jabari*, 273 S.W.3d at 754. A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). In assessing whether the error had a substantial and injurious effect on the jury's verdict, the court of appeals must consider the entire record, including overwhelming evidence of guilt, whether the State emphasized the error, defensive theories, jury instructions, and closing arguments. *See Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). An appellate court should not overturn a criminal conviction for non-constitutional error if the court, after examining the record as a whole, has fair assurance that the error did not influence the jury or had only a slight effect. *See Morales*, 32 S.W.3d at 867.

In this case, there was overwhelming evidence of Thomas's guilt. Gray testified that Thomas assaulted her with a knife on the bus. She identified Thomas in open court, and she identified the knife. The jury not only saw photographs of Gray's injury, but they also had the opportunity to see the permanent scar on her

12

face when she testified. The driver of the bus testified that he saw Thomas swinging the knife. Officer Wiggins testified that when he asked the passengers who had the knife, they pointed to Thomas. He then found the knife on Thomas's body when he conducted a pat-down search.

Thomas had two defensive theories at trial—one advanced by his attorney and one advanced through his testimony—but neither theory denied that he committed the alleged act. His attorney's theory was that Thomas was not guilty by reason of insanity, that is, he did cut Gray's face but he lacked the requisite culpable mental state because of his insanity. Thomas testified that he was not guilty because he acted in self-defense, that is, he did cut a woman's face but his actions were excused because the people on the bus allegedly attacked him first.

In its charge, the court instructed the jury to consider Thomas's prior convictions, if at all, only for the purpose of impeaching his credibility, and not for any other purpose. The court also expressly instructed the jury that the evidence of prior convictions "cannot be considered by you against the defendant as any evidence of guilt in this case." Introduction of the fact of Thomas's prior murder conviction undoubtedly had a prejudicial effect. *See Lott v. State*, 123 Tex. Crim. 591, 596, 60 S.W.2d 223, 225 (1933) ("[T]he frailties of human nature are such that it is expecting much of a jury if they can disabuse their mind of the fact that they are again trying one who has theretofore been convicted or charged with

13

crime."). However, we must presume that the jury followed the court's instructions, and we thus presume that the jury did not consider Thomas's prior conviction as evidence that he was guilty of committing the aggravated assault of Gray. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998); *Jones v. State*, 264 S.W.3d 26, 29 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).

Finally, we note that even though Thomas volunteered the testimony that he was released from prison in 2003 before the State introduced evidence of his prior felony conviction, the murder conviction was not emphasized at trial. The State asked only a single question about the conviction and did not mention it at all in closing arguments. Considering the record as a whole, we conclude that the admission of evidence of Thomas's prior murder conviction did not affect his substantial rights and was not reversible error. *See* TEX. R. APP. P. 44.2(b).

As to the misdemeanor conviction for unlawfully carrying a weapon, the State argued to the court that it was not being offered to Thomas's credibility, *see* TEX. R. EVID. 609, or as character conformity evidence, but as a "signature crime" because it showed a pattern of Thomas brandishing weapons when he is angry, *see* TEX. R. EVID. 404(b). Among other things, the State also argued that because Thomas testified that he did not know his conduct was wrong, the evidence of the conviction was relevant and necessary to show to his knowledge of the wrongfulness of his conduct. Thomas reurged his Rule 403 objection to this

14

evidence. The court ruled that evidence of the prior conviction for unlawfully carrying a weapon would be admissible, however the court cautioned the State that its ruling was "very limited" and the evidence could not be used as character conformity evidence. We agree with Thomas that this misdemeanor conviction could not have been properly admitted under Rule 609 because it was neither a felony nor a crime of moral turpitude. *See* TEX. PENAL CODE ANN. § 46.02 (West 2011) (offense of unlawful carrying of weapons is Class A misdemeanor unless it is committed on any premises license or issued a permit for the sale of alcoholic beverages); *Thomas v. State*, 482 S.W.2d 218, 219 (Tex. Crim. App. 1972) (misdemeanor offense of unlawfully carrying arms is not an offense involving moral turpitude). But this is not the basis upon which the State defends the admissibility of the evidence.

The State offered the misdemeanor unlawful-carrying conviction as evidence that Thomas knew his conduct was wrong. Rule 404 prohibits the admission of evidence of "other crimes, wrongs, or acts . . . in order to show action in conformity therewith." TEX. R. EVID. 404(b). But such evidence "may be admissible" for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Thomas's prior conviction for unlawfully carrying a weapon was relevant to the disputed fact issue concerning his knowledge that his behavior was wrong. His

15

defensive theory of insanity relied nearly entirely on the contention that he did not know that his use of a knife on the bus that day was wrong. But his prior conviction for unlawfully carrying a weapon had some tendency to show his knowledge of the wrongfulness of his actions because he had previously been in trouble with the law in a similar circumstance. *See* TEX. R. EVID. 401 (defining relevant evidence).

Thomas also objected to the admission of this evidence under Rule 403, arguing that it was highly prejudicial. In conducting a balancing test under Rule 403, a court considers (1) the testimony's inherent probative value, (2) its potential to impress the jury in some irrational but indelible way, (3) the amount of trial time the proponent needs to develop such testimony, and (4) the proponent's need for the testimony. *Montgomery v. State*, 810 S.W.2d 372, 389–90 (Tex. Crim. App. 1990); *see Herrera v. State*, 11 S.W.3d 412, 417 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). There is a presumption that relevant evidence is more probative than prejudicial. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997); *see Herrera*, 11 S.W.3d at 417. Here, as we have explained, the evidence was relevant to rebutting Thomas's defensive theory of insanity. Though the evidence may have had some prejudicial influence because it shows that Thomas had previously committed a crime, the court instructed the jury not to consider that as evidence that he was guilty of the charged offense, and we presume the jury

16

followed the court's instructions. *See Colburn*, 966 S.W.2d at 520. The State did not dwell on this evidence: it asked two questions, one of which the jury was instructed to disregard. Finally, as we have explained, this evidence was necessary to rebut Thomas's defensive theory of insanity. We hold that the trial court did not err by admitting this evidence. Even if the admission of this evidence were error, it would be harmless for the same reasons the admission of evidence of Thomas's murder conviction was harmless.

We overrule the issue challenging the admission of evidence of Thomas's prior convictions.

## II.    Charge error

In his second issue, Thomas argues that the trial court erred by overruling his objection to the language in the charge defining "knowingly" in regard to a person's conduct. The jury charge included the following general instructions and definitions regarding intent and knowledge:

> A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

The charge also included the following application paragraph:

17

Now, if you find from the evidence beyond a reasonable doubt that on or about the 6ᵗʰ day of January, 2009, in Harris County, Texas, the defendant, James Harold Thomas, did then and there unlawfully, intentionally or knowingly cause bodily injury to Hon[e]y Gray by using a deadly weapon, namely a knife, then you will find the defendant guilty of aggravated assault, as charged in the indictment.

At the charge conference, Thomas objected to providing a definition of "knowingly" as related to the "nature" of his conduct, arguing that aggravated assault is a result-oriented offense and the instruction was therefore irrelevant to the case. In response, the State argued that it was a proper definition, and the court overruled the objection and denied the request to remove that sentence from the charge. Thomas also noted for the record that he had no objection to the instruction about "intent" with respect to the "result" of his conduct. On appeal, the State concedes that the charge erroneously stated, "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." *See Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994) ("It is error for a trial judge to not limit the definitions of the culpable mental states as they relate to the conduct elements involved in the particular offense.").

Rule 44.2 does not apply to jury-charge error. *See Olivas v. State*, 202 S.W.3d 137, 145 (Tex. Crim. App. 2006). The appropriate standard for all errors in the jury charge, statutory or constitutional, is that set out in *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984). *Id.* When charge error has been

18

properly preserved, reversal is required if the charge error resulted in "some" or "any" actual harm to the defendant. *O'Brien v. State*, 89 S.W.3d 753, 756 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (citing *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986), and *Almanza*, 686 S.W.2d at 171); *see Hill v. State*, 265 S.W.3d 539, 543 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). "The four-part analysis for assessing harm consists of reviewing (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the record of the trial as a whole." *Hill*, 265 S.W.3d at 543.

Considering the jury charge as a whole, we note that the charge correctly defined "intent" in terms of the result of the actor's conduct, and Thomas specifically noted on the record at trial that he had no objection to this definition of an alternative culpable mental state. As to the state of the evidence, we have already explained how the overwhelming weight of the evidence and defensive theories rendered the alleged evidentiary errors harmless. Similarly, the same considerations militate in favor of a determination that the charge error did not cause Thomas any actual harm. In addition, we note that Thomas testified that he intended to harm Gray when he struck at her with a knife.

Finally, both Thomas's counsel and the State emphasized the results-oriented nature of the alleged offense in closing arguments. Defense counsel argued that the State had to prove that Thomas intended to hurt Gray. The State argued that it had proved that Thomas meant to cut Gray.

Considering the record as a whole and the relevant factors, we conclude that the alleged jury-charge error was harmless. We overrule this issue.

## Conclusion

We affirm the judgment of the trial court.


Michael Massengale
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).