

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-13-00314-CR

Latray M. **WHITLEY**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2012CR7038A
Honorable Maria Teresa Herr, Judge Presiding

Opinion by:     Karen Angelini, Justice

Sitting:     Catherine Stone, Chief Justice
            Karen Angelini, Justice
            Luz Elena D. Chapa, Justice

Delivered and Filed:  July 23, 2014

AFFIRMED

Latray M. Whitley was convicted of murder and sentenced to life imprisonment. Whitley brings four issues on appeal: (1) the trial court erred in not permitting him to question a witness about bias; (2) the trial court erred in not permitting him to question a witness about the witness's conviction of a crime pursuant to Texas Rule of Evidence 609(b); (3) the trial court erred in overruling his objection to hearsay; and (4) the evidence is legally insufficient to support his conviction for murder. We affirm.

### BACKGROUND

In the early morning hours of November 8, 2009, Corey Cumby was shot and killed while he drove his car down an interstate in San Antonio, Texas. Cumby was a member of a gang called the East Terrace Gangsters. Appellant Whitley is a member of a rival gang, the Wheatley Court Gangsters. The night of November 8, 2009, Cumby had been at Club Studio, a nightclub in northeast San Antonio. He left the club alone, and as he waited behind a car in the left lane at a light near Loop 410, another car pulled alongside him in the right lane. When the light turned green, Cumby's car, the one alongside him, and the one behind him raced to Loop 410 and then to Interstate 35. The rear window on the driver's side of the car that had been alongside Cumby lowered, and several gunshots were fired at Cumby's car. Cumby's car exited the freeway and came to rest in a ditch off Interstate 35. A witness, Melissa Covarrubia, went to Cumby's car and found Cumby unresponsive. The medical examiner testified that the cause of Cumby's death was a gunshot wound and that the gun was not fired at a close distance.

At trial, thirty-five-year-old Alvin Clark testified that on November 8, 2009, he was at a club and left at closing time, around 2:30 a.m. He noticed a lot of people outside the club, including his cousin Whitley and Whitley's brother Hollis Neally. Whitley, whose nickname is "Pooh," and Neally, whose nickname is "Peanut," were sitting on a car. Clark testified that he was part of the East Terrace Gang, and that Pooh (Whitley) and Peanut (Neally) were part of the Wheatley Courts Gang. Clark admitted that the gangs had been rivals and that "people from East Terrace and people from Wheatley Courts do not get along." However, he testified that on November 8, 2009, the gangs were not at odds.

As Clark left the club, he saw Cumby get into his car. Clark got into his own car and drove south on Perrin Beitel towards Loop 410. According to Clark, when he stopped at a red light, his car was the first one in the left lane. Clark noticed that Cumby was driving the car behind him and

that a blue car, with four people inside, had pulled up alongside him in the right lane. Clark testified Peanut (Neally) was driving the car in the right lane and Pooh (Whitley) was sitting behind Peanut. When the light turned green, Clark entered the freeway. Cumby's car was behind his car. Clark testified, "I got on the freeway and I got over to the left lane and I was driving. And I heard shots and I just – I duck and got on. The car pulled up and let off another shot again. We went our separate ways." Clark testified that Pooh (Whitley) was the one who was shooting at his and Cumby's cars. Clark heard eight shots. According to Clark, after the shooting, the car Peanut (Neally) was driving "flew" past him. The car then dropped back to Clark's car. Clark "took off" and heard another shot. He noticed that fire was coming out of the passenger's side in the back of his car. Clark testified that he did not see what happened to Cumby. A bullet hole pierced Clark's car. Admitted into evidence was a photograph of the bullet hole. Clark testified that the photograph depicted his car in its condition after the shooting on November 8, 2009.

Clark admitted that he has been convicted of being a felon in possession of a firearm. He testified he was currently under federal supervision for possession with intent to deliver cocaine. He testified that he did not have an agreement with the State to testify. When asked why he did not immediately report the shooting, he testified that he had wanted revenge. Clark testified that he eventually made a report to authorities two years after the shooting because someone told him that "they" were going to kill him.

On cross-examination, the defense asked Clark whether his mother had asked him to fabricate a story about Whitley being the shooter because she was mad at her brother, Arthur A. Whitley, testifying against Clark's brother. Clark denied that his mother asked him to fabricate a story. Clark did admit that his mother and her brother did not get along. When asked on cross-examination, Clark testified that he had been incarcerated with Donald Grinage, also a member of the East Terrace Gang. According to Clark, it was Grinage who said that "they" were going to kill

Clark. When the defense asked Clark whether he had a "Rule 35" agreement with the Federal Bureau of Prisons, Clark testified that he did not.

Clark's former wife, Latoya Clark, testified that on the night Cumby was killed, she received a phone call from Clark. According to Latoya, Clark was scared and was yelling that he was being shot at on I-35. The next morning, Latoya learned that Cumby had died. According to Latoya, Clark told her that he thought Pooh (Whitley) had shot at him. Latoya testified that Clark had been driving her car the night Cumby was killed and that there was a bullet hole in it the day after the shooting that had not been there before. Latoya testified that she did not give a statement to police.

Twenty-nine-year-old Donald Grinage testified that on November 8, 2009, he was at Club Studio and saw Cumby at the club. According to Grinage, he did not see any heated arguments or any problems in the club. After leaving the club, he was stopped at a light at the intersection of Loop 410 and Perrin Beitel when he noticed Cumby's car in front of his car. To the right of Cumby's car was a black car with three people in it. Grinage testified that "[w]hen the light turned green, all the cars took off fast, got on the highway." When Grinage got onto the highway, he saw a hand come out the little black car shooting at Corey [Cumby]'s car." Grinage saw Cumby's car exit the freeway. He tried to catch up to the black car but was never able to do so.

Grinage testified that he had a criminal history. He had been on probation for unlawful carrying of a weapon and was currently on probation for possession of a controlled substance. He testified that he did not have an agreement with the State.

Ronald Nagel, the owner of a paint and body shop in Converse, Texas, testified that in November 2009, a customer named "Alvin" brought a Cadillac with a bullet hole in it to the shop. He testified that the car depicted in State's Exhibit 7, which Clark had previously identified as the car he was driving the night of the shooting, was the car brought to the shop. Nagel testified that

he "patched up the hole in the car." According to Nagel, "Alvin" paid cash, and the repair did not get submitted to an insurance company.

Reginald Earl Green, Jr. testified that he and Whitley had gotten to know each other when they were both incarcerated at "GEO," a federal holding facility. According to Green, Whitley told him that on the night Cumby was killed, Whitley received a call directing him to come to Club Studio. He and his brothers drove a rental car to Club Studio to see "East Terrace gang members." Whitley said that he had been upset with Cumby, who was from a rival gang, because Cumby had bought "some rims" from Whitley's brother with counterfeit money. Green testified that Whitley said he was planning to follow Cumby. According to Green, Whitley said that when they pulled up next to Cumby at the light, they could not see if he was in the car because of dark window tint. So, they pulled up ahead to try to look into the front window of the car. Whitley said that he noticed his cousin Clark was in a car in front of Cumby's car. The light turned green, and the cars entered the freeway. "When they got on the highway, [Clark] and [Cumby] started swerving on – swerving inside, outside lanes." This "swaying," which Whitley interpreted as Clark and Cumby showing off their cars and taunting him, made Whitley angry.

According to Green, Whitley said that he and his brothers were "just going to follow them." "The hit wasn't supposed to happen on the highway." "It just so happened when they got on the highway, the opportunity presented itself because wasn't nobody [sic] on the highway but them [sic] cars." Whitley pulled up alongside Clark, and Clark accelerated faster. Then, Cumby accelerated so that Whitley's car was beside Cumby's car. Whitley, who was sitting in the back seat behind the driver, stuck his gun out of the window and shot five or six times. According to Green, Whitley said that after he shot Cumby, "he shot a couple of times at [Clark]." When asked why Whitley said he had shot at Clark, Green testified Whitley's "adrenaline was already going, he was already passing him, and [Clark] just happened to – as [Whitley] was passing [Clark],

[Clark] was just a little bit behind [Whitley], [Whitley] was passing [Clark], so [Whitley] just shot off two shots at time." "Just to shoot." Green testified that Whitley said he used a nine millimeter gun.

Green testified about his criminal history–although he denied being in a gang. Green admitted to "hanging around" gang members from Wheatley Courts. He stated that he had dealt drugs and was on probation for a 2009 conviction for possession of cocaine with intent to deliver. He testified he also had "an aiding in a bank fraud" for which he received time served. He testified he also had a state offense from 2002 for possession of a controlled substance. Green admitted that although Whitley confessed to him in 2010, Green did not attempt to contact anyone until a year later when he told his attorney that he wanted to talk to the authorities. Green further testified that he had been incarcerated with Clark in the summer of 2011. According to Green, Clark asked him which "unit" in the prison he was in. When Green responded, Clark replied, "Well, my cousin was in that unit." Green said, "I heard about what happened with you and you—I heard what happened with you and your cousin about that shooting." But, according to Green, Clark never responded. Green testified that he could tell by Clark's reaction that Clark knew what Green was referring to. "But he never commented on it. He never said nothing." According to Green, prison is not the place to seek revenge because "[t]here is too much at stake."

Teresa Guadalupe Mata, the custodian of records, testified that Whitley was incarcerated at the GEO facility from July 2, 2010 to April 14, 2012 with a break on February 18, 2011. Mata also testified that Reginald Green was incarcerated at the GEO facility from September 25, 2009 to April 18, 2011.

The defense called fifty-six-year-old Arthur A. Whitley as a witness. Arthur testified that he had been incarcerated several times and that most of his incarcerations had been a result of drugs. Arthur testified he assisted the Bexar County District Attorney's Office in the prosecution

against his sister's son Robert Thorn, who is Clark's brother. According to Arthur, the son of his other sister was killed in the 1990s when he was about twenty years old, and Arthur's sisters blamed his son Peanut (Neally) "for some of it." Arthur also testified that his girlfriend, Sonia, is angry with him "all the time." Arthur testified,

> So my sister goes to her to get her to talk to these people, you know, against this boy here, Pooh [Whitley]. Because she know this girl is mad, so she gave her phone number to people to call and told her what to say, whatever, whichever. That's what happened.

Arthur claimed his sisters' forcing Clark to testify against Whitley is their "way of getting at us, you know."

Sonia Cavanaugh testified that she was Arthur's girlfriend of four years and had been Reginald Green's girlfriend. She admitted to having pending charges of cocaine possession. She testified that in November/December of 2009 or early 2010, Whitley's aunt, Earline Houston, approached her and asked her to pick up a card with a detective's name on it. The detective was related to Whitley's case. Sonia testified that she never picked up the card.

After hearing all the evidence, the jury convicted Whitley of murder. Whitley was sentenced to life imprisonment.

## DISCUSSION

In his first issue, Whitley argues that he "was not permitted to present to the jury evidence that a witness for the prosecution, Alvin Clark, was biased by a potential reduction in a federal prison sentence that he was serving." According to Whitley, a "Rule 35" agreement refers to Federal Rule of Criminal Procedure 35, which permits a witness to obtain a reduction to a witness's federal prison sentence. Whitley argues that "Clark was never questioned about the possibility of obtaining a 'Rule 35' agreement because he did not currently have one." According to Whitley, "if Mr. Clark had hopes or plans of obtaining one then it should have been admissible in front of

the jury." "This provides a particularly powerful incentive for the witness to testify for the prosecution and the defense should have been permitted to explore the witness's bias." In support of this argument, Whitley points to page 87 of volume 3 of the reporter's record. On page 86 to 87 of volume 3 of the reporter's record, Clark is being cross-examined by Whitley's attorney. Clark testified that he was a federal prisoner in Floresville with Reginald Green:

> Q:      Are you familiar with – there's a rule in Bureau of Prisons, Rule 35. Are you familiar with that?
>
> A:      Yeah.
>
> Q:      Did you have a Rule 35 agreement?
>
> A:      No.
>
> Q:      Okay. Would you tell the ladies and gentlemen of the jury what Rule 35 is?
>
> > State:      Objection. If he didn't have one, it's not relevant.
> >
> > Defense:      If he knows about it, Judge. He testified he knew about it.
> >
> > Court:      All right. Can I see the attorneys at the bench, please?
> >
> > > (outside presence of jury)
> >
> > Court:      Are you about to go into one of the things we were talking about in the motion for limine, counsel?
> >
> > Defense:      (no response)
> >
> > Court:      Were you about to---
> >
> > Defense:      Yes, Judge. Yes, yes. I'm sorry.
> >
> > Court:      And what was the question you were asking?
> >
> > Defense:      If he was aware of the Rule 35.
> >
> > Court:      So tell me what a Rule 35 agreement is.
> >
> > Defense:      Rule 35 agreement is when they have an agreement with the Bureau of Prisons in return for providing information.

Court:        Okay. Well, didn't I say that we were going to take that issue up outside the presence of the jury before we went into it in front of the jury?

Defense:     Yes, ma'am. I'm sorry.

Court:        All right.

Defense:     I apologize.

Court:        Don't do it again . . . . Ask the question. Let's see what the answers are.

(outside presence of jury)

Q:    Are you familiar with what Rule 35 is?

A:    Yeah, I heard what Rule 35 is, but I didn't have a Rule 35.

Q:    Okay.

Court:        Your objection is sustained. We're not going into that. We'll resume at 1:15 p.m.

On appeal, Whitley argues that he "wished to demonstrate that the witness was aware of a federal program that might have provided the opportunity for the witness to have time taken off of his sentence for cooperating with the prosecution of the Defendant." According to Whitley, "[w]hether the witness would have been able to obtain a reduction in sentence is not the issue; rather the possibility of obtaining one in the witness's mind and the accompanying motivation to testify in a way that would make that more or less likely is the issue that should have been addressed." However, as pointed out by the State, Whitley did not attempt to inquire about the potential of a future Rule 35 agreement between Clark and the Bureau of Prisons. Nor did he attempt to ask Clark if he believed his testimony would result in a sentence reduction. He did not argue to the trial court, or attempt to make a bill of exception, about Clark's belief of a potential agreement constituting bias. Only now on appeal does Whitley argue that the mere potential of a possible agreement was admissible evidence of bias under Texas Rule of Evidence 613(b). Whitley

cannot now argue that the trial court limited his ability to impeach Clark about Clark's belief regarding a future agreement with the Bureau of Prisons when Whitley never made such an argument to the trial court. We find no abuse of discretion by the trial court. *See Montgomery v. State*, 810 S.W.2d 372, 387, 391 (Tex. Crim. App. 1991) (opinion on reh'g) (holding that the trial court's rulings concerning the admissibility of evidence are reviewed for abuse of discretion).

Whitley also argues that the trial court violated his right to confront and cross-examine Clark under the Sixth Amendment to the Constitution and Article 1, section 10 of the Texas Constitution. However, the record does not reflect that Whitley objected to the trial court allegedly violating his constitutional rights. *See Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004) (explaining that right to confront witnesses is a trial right and may be waived on appeal if a defendant fails to object at trial). Citing *Simmons v. State*, 548 S.W.2d 386 (Tex. Crim. App. 1977), Whitley claims the trial court refused to allow him to develop a full bill of exception regarding Clark's bias when the trial court stated, "Your objection is sustained. We're not going into that. We'll resume at 1:15." We disagree. The trial court's statements cannot be interpreted as refusing to allow Whitley to make a bill of exceptions. We overrule Whitley's first issue.

In his second issue, Whitley complains that he "was forbidden to ask about witness Reginald Green's conviction for a crime of moral turpitude under Texas Rule of Evidence 609(b)." Whitley points to his cross-examination of Green:

Q:      You got a conviction for a bank fraud, is that right?

A:      Yeah.

Q:      What was that for?

A:      A bank fraud?

Q:      But what was it? Was it involving counterfeit money?

A:      No. Checks.

Q:     Counterfeit checks or –

A:     No, wasn't nothing counterfeit. Just personal checks.

Q:     And these were checks that you stole from folks or –

State:   Judge, I think this goes beyond the scope.

Court:  Yes. Sustained.

Q:     How many months did you get on your possession with intent to deliver crack cocaine?

A:     I got 74 months.

As shown above, Whitley was allowed to inquire into Green's crime of moral turpitude. *See* TEX. R. EVID. 609. What he was not allowed to inquire into was the specifics of the crime. While a conviction of a crime is admissible to impeach a witness pursuant to Rule 609, details of the offense are not admissible. *See* TEX. R. EVID. 609(a) ("For the purpose of attacking the credibility of a witness, evidence that the witness *has been convicted of a crime* shall be admitted if . . . .") (emphasis added); *Mays v. State*, 726 S.W.2d 937, 953 (Tex. Crim. App. 1986); *Jabari v. State*, 273 S.W.3d 745, 753 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *Lape v. State*, 893 S.W.2d 949, 958 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd).[1] We find no abuse of discretion by the trial court.

In his third issue, Whitley complains that the State was permitted over defense objection to introduce the hearsay testimony of Alvin Clark through Latoya Clark. Latoya testified that on the night Corey Cumby was killed, she received a call from Alvin Clark, who was scared and

---

[1] We note that neither on appeal nor at the trial court did Whitley argue that his rights under the Confrontation Clause were violated by the trial court's denying him an opportunity to question Green specifically about his past crime. *See* *Johnson v. State*, No. PD-0473-13, 2014 WL 2742829 (Tex. Crim. App. June 18, 2014) (explaining accused's rights of confrontation on cross-examination).

yelling. According to Latoya, Alvin Clark said he was being shot at on I-35. Defense counsel then objected to the following questioning by the State:

Q:      When did you find out that Corey had died?

A:      The next morning.

Q:      Okay. At that time, did Ray Ray [Alvin Clark] tell you –

  Defense:    Objection, Your Honor, call for hearsay.

  State:      I think I need to finish the question because I have a response.

  Court:      All right. Go ahead.

Q:      Did Ray Ray [Alvin Clark] tell you who were the ones [sic] who were involved in the shooting at him?

  Defense:    Objection, Your Honor, it calls for hearsay.

  State:      And under 801(e), it is not hearsay. The argument has been that these guys cooked this up. He's shown that there was motive for Ray Ray to say—Alvin Clark to say that was his testimony. That's what they suggested. Motive that he recently made it up with Green while he was in prison. And this is not even hearsay; it is to show–to rebut the motive that he's argued and the argument of recent fabrication.

  Defense:    It's hearsay, Judge. She's relying on what someone told her. Also, if it's anything that they're using it for, it's for purpose of bolstering.

  Court:      All right. Your objection is overruled.

  State:      Thank you.

Q:      Did Ray Ray [Alvin Clark] tell you who he thought were the ones involved in the shooting?

A:      He said he thought it was his cousin.

Q:      Okay. And did he give you a name who he thought had shot him?

A:      Pooh [Whitley].

Texas Rule of Evidence 801(e)(1)(B) provides that a statement is not hearsay if (1) the declarant testifies at the trial and is subject to cross-examination concerning the statement; (2) the statement is consistent with the declarant's testimony; and (3) the statement is offered to rebut an express or implied charge against the declarant of recent fabrication, or improper influence or motive. TEX. R. EVID. 801(e)(1)(B); *see Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007). First, Alvin Clark, the declarant, testified at trial and was subject to cross-examination. *See Hammons*, 239 S.W.3d at 804. Second, Latoya's testimony that Alvin Clark told her Whitley had shot at him was consistent with Alvin Clark's testimony at trial. *See id.* Third, this testimony by Latoya was offered to rebut an express or implied charge against Alvin Clark of recent fabrication. *See id.* During its cross-examination of Alvin Clark, the defense thoroughly examined him on his knowledge of the events leading to Cumby's death and his testimony that Whitley fired the handgun at him and at Cumby. Defense counsel questioned Alvin Clark about why he delayed giving a statement to the authorities for more than two years. Defense counsel suggested on cross-examination that while Alvin Clark and Reginald Green were incarcerated at the same institution in 2011, they collaborated to fabricate the story that Whitley had fired the handgun and killed Cumby. Thus, there was an express or implied charge of recent fabrication of Alvin Clark's testimony by the defense. *See id.* Finally, Latoya testified that the statement made by Alvin Clark over the telephone was made prior to the time Alvin Clark and Reginald Green were incarcerated together. *See id.* ("The prior consistent statement must be made prior to the time that the supposed motive to falsify arose."). We find no abuse of discretion by the trial court in overruling defense counsel's hearsay objection.

In his final issue, Whitley argues that the evidence is insufficient to support his conviction of murder. In a federal due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 1763 (2012). The court of criminal appeals has explained that this standard "recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence." *Adames*, 353 S.W.3d at 860. Therefore, on appellate review, we determine whether based on "cumulative force of all the evidence" the necessary inferences made by the trier of fact are reasonable. *Id.* We conduct this constitutional review by measuring the evidentiary sufficiency with "explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.*; *see Cada v. State*, 334 S.W.3d 766, 773-74 (Tex. Crim. App. 2011) (explaining that sufficiency of evidence is measured by hypothetical jury charge as "authorized by the indictment").

As authorized by the indictment in this case, the evidence is sufficient to support Whitley's conviction of murder if it shows he (1) intentionally or knowingly caused the death of Cumby; or (2) he intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused the death of Cumby. *See* TEX. PENAL CODE ANN. § 19.02(b)(1),(2) (West 2011). Whitley argues the evidence is insufficient because "[i]n this case, there was no witness [who] testified against [him who] did not have serious issues with credibility." According to Whitley, "each witness either had issues with [his or her] credibility in general, questions of bias and motivation to testify against [Whitley] or a combination of the two." Whitley claims that "[w]hen combined with the lack of any real physical evidence that indicated that [he] was guilty, the sincere lack of credibility that each prosecution witness had could not permit any jury to be rationally justified in finding that the prosecution had met [its] very high burden of proof beyond a reasonable doubt." Whether witnesses are credible, however, is within the province of the jury. *See Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000). We must defer to the jury who is in the position

of evaluating the credibility and demeanor of witnesses. *See id.*; *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999) (explaining that the jury, as the trier of fact, is the sole judge of the credibility of the witnesses and of the strength of the evidence). Thus, whether the witnesses were truthful or dishonest was for the jury to determine. In looking at the evidence presented at trial, it is undisputed that Cumby was shot and killed in his car on November 8, 2009, from a nine millimeter gun as he was travelling on I-35. Clark testified that it was Whitley who shot at him and Cumby. Green testified that Whitley confessed to him that he had shot and killed Cumby. Latoya Clark testified that on the night of the murder, Clark called her in an excited manner and told her that he was being shot at. He told her that Whitley shot at him. Latoya confirmed that there was a bullet hole in the car Clark was driving that had not been there before the night of the murder. We hold the evidence is sufficient to support Whitley's conviction.

We affirm the judgment of the trial court.

Karen Angelini, Justice

Do not publish