**Opinion issued February 14, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-18-00316-CR**

———————————

**ANTOINE ALLEN GORMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 83250-CR**

## MEMORANDUM OPINION

A jury convicted appellant Antoine Allen Gorman for the first-degree felony offense of injury to a child. *See* TEX. PENAL CODE § 22.04. Gorman pleaded true to two enhancement allegations, and the jury assessed punishment at life in prison. *See id.* §§ 12.32, 12.42(d) (establishing enhanced punishment range of 25 to 99

years or life in prison). In his sole appellate issue, Gorman argues that the trial court erred by admitting evidence that sperm cells were found in the infant complainant's mouth, despite his objections that the evidence was irrelevant and that any probative value was substantially outweighed by the danger of unfair prejudice. We conclude that the trial court did not err by admitting this evidence, and we affirm.

## Background

About a month after Tashiay Nelson gave birth to M.N., she invited appellant Antoine Allen Gorman to live with her in Freeport. Nelson knew Gorman only from social media, and he had told her that his name was Luther Jefferson. A few weeks later, Nelson left him to care for three of her children—J.Z.N., who was four years old, J.N., who was three years old, and M.N., who was seven weeks old—while she went to work. When Nelson left, sometime before 8:00 a.m., Gorman and the three-year-old were asleep, and J.Z.N. and M.N. were awake in the bedroom shared by the children. Around 11:00 a.m. J.Z.N. went to her aunt's apartment in the same apartment complex. The aunt, Tyshanique Nelson, had agreed to put J.Z.N. on the bus to preschool around noon.

J.Z.N. told her aunt that "Luther" had put the baby's head in the toilet, and when questioned, she went to the bathroom and pantomimed what she meant: a person holding a baby and dunking its head into the toilet water. Tyshanique and

J.Z.N. returned to Nelson's apartment to confront Gorman. He denied the accusation and yelled at J.Z.N., who began crying and retracted her statement. Gorman was holding M.N. on his shoulder, but Tyshanique did not see his face, hear him make any noise, or touch him.

Meanwhile, Gorman, identifying himself as "Twan," had been communicating with another woman, Crystal Griggs, whom he met that day on the same website where he met Nelson. Gorman and Griggs communicated throughout the day. In the mid-afternoon, Gorman went to a neighbor's apartment and asked for a ride to Houston, but the neighbor declined. The neighbor later testified that the front of Gorman's shirt was wet. Gorman asked Griggs to come visit him, and, in the late afternoon or early evening, he convinced her to drive him to Houston.

That evening, a neighbor noticed that J.Z.N., J.N., and Tyshanique's minor children were all together on a stairwell without any adult supervision. The neighbor informed Tyshanique, who met Nelson at her apartment when she arrived home around 7:00 p.m. Nelson found M.N. in his bouncy seat in the apartment, and when she realized he was not breathing, neighbors attempted CPR and called for emergency services. M.N. was taken by ambulance to the emergency room where his body temperature was measured at 78° F, and he was pronounced dead.

The next day, Gorman sent Griggs text messages asking her to lie to the police about what happened the day before. First, he asked her to say that she had

been with him all day. Second, he asked her to say that she heard Nelson in the background while speaking to him on the phone. He also asked her to leave the state with him. Griggs declined all of his requests, and she turned over images of the text messages to police.

Nelson gave the police a photograph of Gorman, and he was later arrested on a warrant for child abandonment. Gorman was questioned by the Freeport Police Department. At first, he denied having harmed M.N. in any way, and he asserted that the baby was alive when he left the apartment to meet Griggs. Later, he confessed to twice dunking M.N.'s head into the toilet because he was frustrated with the baby's crying. Gorman said that after dunking the baby in the toilet, he took a nap. He admitted that he knew M.N. was already dead when he asked a neighbor and later Griggs for a ride to Houston. Gorman contended that he panicked and fled after M.N. died.

Investigators documented water and a soaked and warped roll of toilet paper on the floor of the master bathroom, along with wet shoe prints on the floor in the master bedroom of Nelson's apartment. At trial, two City of Freeport law enforcement officers testified that they had been told that a baby had been drowned or dunked in a toilet by his mother's boyfriend.

An autopsy was performed on M.N. by the Galveston County Medical Examiner, under contract with Brazoria County. Although the autopsy report did

not identify a cause or manner of death, both the medical examiner who performed the autopsy, Dr. Nobby Mambo, and his supervisor, Dr. Erin Barnhart, testified that, based on the findings, M.N. died from unnatural causes, by suffocation or drowning, hours before he was found. Dr. Mambo testified that injuries to M.N.'s torso could not have been self-inflicted or attributed to CPR. Because the injuries had not begun to heal, he concluded that they were inflicted minutes before M.N.'s death. Dr. Barnhart testified that no natural disease process was consistent with the totality of observations made during the autopsy. Dr. Mambo observed injuries seen "in cases of suffocation, either accidental or homicidal," including changes in the brain and small areas of bleeding on both lungs. He also observed fluid in the lungs, bubbly froth in the trachea, and bloody liquid coming from the mouth consistent with drowning. Dr. Mambo opined that something was done to obstruct M.N.'s airways and that semen was capable of obstructing infant's airways. Dr. Barnhart testified that the frothy liquid found in M.N.'s trachea and lungs was consistent with him being dunked in a toilet. Finally, because M.N.'s temperature was so low when he arrived at the hospital, both Dr. Mambo and Dr. Barnhart, believed that he had been dead for hours when he was found.

DNA tests were performed on swabs taken from M.N. during the autopsy. After Gorman's DNA was found on the swab taken from the inside of M.N.'s mouth, Dr. Mambo suggested testing that swab for the presence of semen. Sperm

cells were found in that sample, but there was an insufficient amount of the sperm cell fraction to perform another DNA analysis.

Gorman was charged with injury to a child. The indictment alleged that Gorman had intentionally or knowingly caused M.N. serious bodily injury by: (1) dunking him in a toilet containing water; (2) submerging his face in a toilet containing water; (3) grabbing him by the foot and dunking him in a toilet containing water; (4) submerging his head in a toilet containing water; (5) shaking him; (6) dunking him in water; (7) failing to seek or provide timely medical care to him after dunking him in a toilet containing water while Gorman had assumed care, custody, or control of him; or (8) unknown means.

Before trial, the court held a hearing on Gorman's motion to exclude evidence that semen or sperm cells were found in M.N.'s mouth. The State presented live testimony from Angelina Temple, a forensic scientist with the Department of Public Safety. She interpreted the DNA results from the oral swab sample from M.N. She testified that the DNA profile of the oral swab was a mixture of three individuals, including M.N. and Gorman. She testified that a second analysis "was able to confirm sperm cells" on the swab from M.N.'s

mouth. Temple explained that further DNA testing of the sperm cells was inconclusive as to whether Gorman was a contributor.[1]

Gorman objected that the evidence was irrelevant and that any probative value was outweighed by the danger of unfair prejudice caused by the introduction of evidence that semen was found in M.N.'s mouth, especially in light of the inconclusive result of the second analysis. The State responded that the evidence was relevant because the cause of death was unknown, but consistent with a sexual act that could cause semen to be in the baby's mouth. The State also argued that the evidence was relevant to motive, positing that Gorman put the baby's head in the toilet to wash away evidence of a sexual assault. Finally, the State argued that it intended to introduce other evidence that Gorman was the only adult man with M.N. the day he died.

---

[1] Temple performed a differential extraction and separated a sperm cell from the rest of the sample to attempt to "identify the possible source of the semen." She said there was "very little DNA profile information obtained from the sperm cell fraction," but she did obtain a DNA profile. She testified that the "sperm cell fraction was interpreted as a mixture of two individuals." M.N. was "an assumed contributor," and "it was inconclusive whether Antoine Gorman was a contributor to the profile." She explained that both "contributors in the sperm cell fraction were very close to the analytical threshold" below which there was no certainty that the peaks obtained were DNA peaks as opposed to "noise from the machine or some other kind of artifact." On cross-examination, she agreed that in the second analysis—the sperm fraction—she could not identify the contributor because the sample was too small. She could "say semen was detected" in the sample, but she had no personal knowledge of how it came to be present.

The trial court ruled that the evidence of both analyses was relevant and more probative than prejudicial. As to the analysis of the sperm fraction of the sample, however, the court also noted that it would "allow the entirety of cross-examination with regard to the results being inconclusive . . . and then the jury can decide what weight, if any, to give to that second analysis."

Temple testified at trial, and evidence that sperm cells were found in M.N.'s mouth also was introduced through the testimony of Dr. Mambo and Dr. Barnhart. The jury found Gorman guilty of injury to a child, and after a punishment hearing, it assessed punishment at life in prison. Gorman appealed.

**Analysis**

On appeal, Gorman argues that the trial court erred by admitting evidence that sperm cells were found in M.N.'s mouth. He contends that the evidence was irrelevant because there was no conclusive analysis connecting him to the sperm cells found in M.N.'s mouth. He also asserts that any probative value of the evidence was outweighed by the unfairly prejudicial nature of the evidence, which focused the jury on a sexual assault rather than the charged offense of injury to a child.

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *Gibbs v. State*, 555 S.W.3d 718, 731 (Tex. App.—Houston [1st Dist.]

8

2018, no pet.). A trial court abuses its discretion by acting arbitrarily, unreasonably, without reference to any guiding rules or principles, *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990), or by making a decision that is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Henley*, 493 S.W.3d at 83 (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)). The trial court, as gatekeeper, resolves any preliminary question related to the admissibility of evidence. *See* TEX. R. EVID. 104(a) ("The court must decide any preliminary question about whether . . . evidence is admissible."). We will uphold a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## I.     The evidence was relevant.

"Relevant evidence is generally admissible, irrelevant evidence is not." *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018) (citing TEX. R. EVID. 402). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. "Evidence does not need to prove or disprove a particular fact by itself to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving a fact of consequence." *Gonzalez*, 544 S.W.3d at 370. "A 'fact of consequence' includes

either an elemental fact or an evidentiary fact from which an elemental fact can be inferred." *Henley*, 493 S.W.3d at 84. Although relevant evidence need not independently prove an element of the charged offense, it must not be "wholly unconnected to an elemental fact." *Id.*

The State was required to prove that Gorman intentionally or knowingly caused M.N. serious bodily injury. Only four-year-old J.Z.N. witnessed the alleged dunking of M.N. in the toilet, and she did not testify at trial. Thus, the State's case rested on circumstantial evidence.[2]

Gorman rested on his presumption of innocence, and in closing, his attorney argued that M.N.'s death was unexplained. He asserted that even the medical examiners had been unable to determine a cause of death, and he questioned why the sole alleged eyewitness, J.Z.N., did not testify. He characterized his recorded statement to police as Gorman "nodding his head with leading questions posed to him by a very skillful interrogator."

The evidence that semen was found inside M.N.'s mouth was connected to a fact of consequence, that Gorman intentionally or knowingly committed an act that

---

[2] The circumstantial evidence included J.Z.N.'s statements to her aunt, the physical evidence of water found on the floor of the master bathroom and bedroom, the fact that Gorman was the only adult male alone with M.N., the medical examiners' statements that M.N. died from suffocation or drowning, Gorman's recorded statement to police, evidence of his flight from the scene, and text messages to Griggs asking her to create a false alibi for him. In addition, the State introduced evidence, which is not challenged on appeal, that Gorman's DNA was found inside M.N.'s mouth.

injured M.N., in two ways. Gorman was the only adult man alone with the children the day that M.N. died, and his DNA was found in M.N.'s mouth. Dr. Mambo testified that M.N. died due to an obstruction to his airway and that semen would be capable of obstructing the airway of a seven-week-old infant. Dr. Mambo also testified that sperm cells could be present in the baby's mouth only if an adult man committed a sexual act. The evidence that sperm cells were found in M.N.'s mouth provided at least "a small nudge toward proving or disproving" that Gorman acted intentionally or knowingly to injure M.N. *See Gonzalez*, 544 S.W.3d at 370.

Second, the evidence provided a motive for Gorman to dunk M.N.'s head into water: to wash away evidence of a sexual act. On appeal, Gorman asserts that this evidence was not necessary because motive is not an element of the charged offense. But in the trial court, his defense was to argue that the totality of the circumstantial evidence did not prove that he committed the charged offense. In making this argument, defense counsel discounted the recorded statement to police, describing it as something other than a confession. In light of Gorman's defensive theory, evidence of sperm cells found in M.N.'s mouth was not "wholly disconnected," *Henley*, 493 S.W.3d at 84, from an elemental fact because it made the fact that he dunked the baby in the toilet more probable "than it would be without the evidence." TEX. R. EVID. 401.

11

Gorman argues that evidence that semen was found in M.N.'s mouth was irrelevant because the laboratory results were inconclusive. This argument concerns the weight to be given to the evidence, not its admissibility. *See Foster v. State*, 779 S.W.2d 845, 861 (Tex. Crim. App. 1989) ("A lack of positive identification of an object, such as a weapon, connected with the alleged crime affects the weight of the object as evidence, rather than its admissibility.").

We conclude that the trial court did not abuse its discretion by finding that the challenged evidence was relevant. *See Henley*, 493 S.W.3d at 82–83; *Montgomery*, 810 S.W.2d at 380.

## II. The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

Gorman also argues that the court erred by admitting the challenged evidence because any probative value that it had was outweighed by the inflammatory and unfairly prejudicial nature of the evidence. On appeal, he argues that the challenged evidence shifted the focus of the trial "from a crime of anger to trying to wipe away evidence of a sexual assault."

Evidence that is relevant may nevertheless be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403; *see Gigliobianco v. State*, 210 S.W.3d 637, 640 (Tex. Crim. App. 2006); *Montgomery*, 810 S.W.2d

12

at 388. When conducting a Rule 403 analysis, a court must balance the probative force of and the proponent's need for the evidence[3] against (1) any tendency of the evidence to suggest decision on an improper basis;[4] (2) any tendency of the evidence to confuse or distract the jury from the main issues;[5] (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence;[6] and (4) the likelihood that presentation of the evidence will amount to undue delay. *Gigliobianco*, 210 S.W.3d at 641–42. We presume that relevant evidence is more probative than unfairly prejudicial. *Montgomery*, 810 S.W.2d at 388; *Smith v. State*, 355 S.W.3d 138, 154 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Exclusion of evidence under Rule 403 is required "only when there is a 'clear disparity between the degree of prejudice of the offered evidence and its probative value.'" *Hammer v.*

---

[3] Probative value refers to how strongly the evidence "serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Gigliobianco v. State*, 210 S.W.3d 637, 640 (Tex. Crim. App. 2006).

[4] Unfair prejudice refers to a tendency to suggest a decision on an improper or emotional basis, such as by arousing "the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence." *Id.* at 641.

[5] Confusion of the issues refers to distracting the jury from the charged offense. *See id.*

[6] Misleading the jury refers to a "tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds." *Id.*

*State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)).

**Probative value.** The evidence that sperm cells were found in the baby's mouth was probative as circumstantial evidence tending to make it more likely that Gorman committed an act that injured M.N. However, there was overwhelming other evidence that Gorman had intentionally dunked M.N. in toilet water. Although the evidence was probative, the need for the evidence was low. This factor neither weighs in favor of exclusion or admission of the evidence.

**Danger of unfair prejudice.** "[S]exually related bad acts and misconduct involving children are inherently inflammatory." *Pawlak v. State*, 420 S.W.3d 807, 809 (Tex. Crim. App. 2013). This factor weighs in favor of exclusion.

**Misleading the jury.** Gorman argues on appeal that the challenged evidence changed the focus of the jury from the nature of the charged offense of injury to a child to his alleged attempts to wash away evidence of assault. At trial, the court allowed wide latitude to defense counsel to cross-examine Temple about the inconclusive nature of the analysis of the sperm sample.[7] Because the jury was informed about the limitations of the second analysis, the trial court could have

---

[7]    In addition, defense counsel thoroughly cross-examined Dr. Mambo about his findings, including the fact that there was no evidence that there was semen in the frothy liquid found in M.N.'s body and that the cause of death was undetermined.

14

reasonably concluded that the jury was equipped to evaluate the evidence. *See Gigliobianco*, 210 S.W.3d at 642. This factor does not weigh in favor of exclusion.

**Undue delay**. Temple's testimony took about an hour out of a week-long trial, but her testimony about the semen sample took less than 20 minutes. The challenged evidence did not unduly delay or extend the trial. This factor does not weigh in favor of exclusion.

* * *

Having considered the various factors relevant to a Rule 403 admissibility determination, we conclude that there was not a clear disparity between the degree of prejudice of the challenged evidence and its probative value. *See Hammer*, 296 S.W.3d at 568; *Conner*, 67 S.W.3d at 202. The trial court could have reasonably concluded that the probative value of the evidence was not substantially outweighed by the countervailing factors specified in the rule. *See Gigliobianco*, 210 S.W.3d at 642–43. Accordingly, we conclude that the court did not abuse its discretion by admitting the challenged evidence. *See id.*; *Henley*, 493 S.W.3d at 82– 83; *Montgomery*, 810 S.W.2d at 379–80.

In addition, had we reached an opposite conclusion, we would nevertheless affirm the trial court's judgment because Gorman has not demonstrated that he was harmed by the admission of the challenged evidence. The erroneous admission of evidence is subject to a harm analysis under Rule 44.2(b) of the Texas Rules of

15

Appellate Procedure. *Jabari v. State*, 273 S.W.3d 745, 754 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Under Rule 44.2, any non-constitutional error, defect, irregularity, or variance that does not affect substantial rights is disregarded. TEX. R. APP. P. 44.2(b); *Jabari*, 273 S.W.3d at 754. A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). When conducting a Rule 44.2(b) harm analysis based upon the erroneous admission of evidence, an appellate court should consider everything in the record, including

> any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, the jury instructions, the State's theory and any defensive theories, closing arguments, voir dire, and whether the State emphasized the error.

*Rich v. State*, 160 S.W.3d 575, 577–78 (Tex. Crim. App. 2005).

There was overwhelming evidence that Gorman intentionally or knowingly caused M.N. serious bodily injury. The circumstantial evidence included J.Z.N.'s statements to her aunt, the physical evidence of water found on the floor of the master bathroom and bedroom, the fact that Gorman was the only adult male alone with M.N., the medical examiners' statements that M.N. died from suffocation or drowning, evidence that Gorman's DNA was found inside M.N.'s mouth, Gorman's recorded statement to police, evidence of his flight from the scene, text

16

messages to Griggs asking her to create a false alibi for him, and the death of a seven-week-old infant. In the punishment phase of trial, Gorman pleaded true to two prior offenses involving possession and distribution of drugs near a playground. Other evidence offered at punishment included additional uncharged offenses committed while in jail awaiting trial. Although the State mentioned the presence of semen in M.N.'s mouth during its closing arguments, considering the other evidence admitted at trial, there is no indication that the challenged evidence substantially influenced the jury's verdict. *See* TEX. R. APP. P. 44.2(b).

## Conclusion

We overrule Gorman's sole issue, and we affirm the judgment of the trial court.

Peter Kelly
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.

Do not publish. TEX. R. APP. P. 47.2(b).

17